# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA BUSTOS RAMIREZ,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>MERRILL GARDENS, LLC,<br><br>　　　　　Defendant. | Lead Case No. 1:22-cv-00542-SAB<br>Member Case No. 1:22-cv-01042-SAB<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND SETTING FINAL APPROVAL HEARING FOR MAY 29, 2024<br><br>(ECF Nos. 28, 39, 44, 46-53) |

## I.

## INTRODUCTION

Currently before the Court is a proposed settlement agreement encompassing the settlement of two related, and now consolidated, putative wage and hour class and representative actions, <u>Ramirez v. Merrill Gardens, LLC</u>, Case No. 1:22-cv-00542-SAB (the "<u>Ramirez</u> Action", and <u>Holguin v. Merrill Gardens, LLC</u>, Case No. 1:22-CV-01042-SAB (the "<u>Holguin</u> Action"), pending in the United States District Court for the Eastern District of California.  (ECF No. 28.) The actions are brought by Maria Bustos Ramirez and Ramona Christina Holguin (hereinafter "Plaintiffs") on behalf of non-exempt employees employed by Defendant Merrill Gardens, LLC, in California at any time from March 8, 2018, through the date upon which the Court grants preliminary approval of the class action settlement.

1    Plaintiffs primarily allege that Defendant did not provide legally compliant meal periods
2    and rest breaks, did not reimburse employees for business expenses, did not compensate
3    employees for all time worked, and, as a result, wage statements provided to employees were
4    rendered inaccurate, final wages were not timely paid, and the conduct violated the California's
5    Private Attorneys General Act of 2004 ("PAGA") and California's Unfair Competition Law
6    ("UCL").  Defendant disputes these claims.  Following the production of policy documents, time
7    records, and pay data, and negotiation at mediation, Plaintiffs and Defendant (the "Parties")
8    reached a proposed settlement of both cases valued at $825,000.00 for approximately 3,780
9    putative class members.

10   Having considered the moving papers, the declarations and exhibits attached thereto, the
11   arguments presented at the hearing held on October 4, 2023, the supplemental briefing and
12   amended settlement agreement filed following the hearing, as well as the Court's file, the Court
13   issues the following order granting the motion for preliminary approval of settlement,
14   conditionally certifying the class for purposes of settlement, and setting a final approval hearing.

15                                           **II.**

16                                      **BACKGROUND**

17   On March 8, 2022, Plaintiff Maria Bustos Ramirez ("Ramirez") filed a putative class
18   action complaint in the Superior Court of the State of California for the County of Los Angeles,
19   entitled <u>Maria Bustos Ramirez v. Merrill Gardens, LLC</u>, Case No. 22STCV08363.  (<u>See</u> ECF
20   No. 1.)  Plaintiff's Complaint asserted the following eight causes of action: (1) failure to pay
21   minimum wages (Cal. Lab. Code §§ 204, 1194, 1194.2, and 1197); (2) failure to pay overtime
22   compensation (Cal. Lab. Code §§ 1194 and 1198); (3) failure to provide meal periods (Cal. Lab.
23   Code §§ 226.7, 512); (4) failure to authorize and permit rest breaks (Cal. Lab. Code §§ 226.7);
24   (5) failure to indemnify necessary business expenses (Cal. Lab. Code § 2802); (6) failure to
25   timely pay final wages at termination (Cal. Lab. Code §§ 201-203); (7) failure to provide
26   accurate itemized wage statements (Cal. Lab. Code § 226); and (8) violation of California's UCL
27   (Cal. Bus. & Prof. Code §§ 17200, <u>et seq.</u>).  (<u>See</u> ECF No. 1 at 20.)

28   On April 18, 2022, this action was removed to the United States District Court for the

Central District of California.  (See ECF No. 1.)  On May 5, 2022, pursuant to the parties' stipulation, the Ramirez Action was transferred to the United States District Court for the Eastern District.  (ECF Nos. 14, 15, 16.)  On June 15, 2022, Plaintiff Ramirez filed a first amended complaint ("FAC") adding claims for civil penalties under PAGA, California Labor Code §§ 2698 et seq.  (FAC, ECF No. 21.)

On June 6, 2022, Plaintiff Holguin filed the Holguin Action, a putative class and PAGA action alleging the following causes of action: (1) failure to pay all minimum wages (Cal. Lab. Code §§ 204, 1194, 1194.2, and 1197); (2) failure to pay all overtime wages (Cal. Lab. Code §§ 510, 1194, and 1198); (3) failure to provide rest periods and pay missed rest period premiums (Cal. Lab. Code § 226.7); (4) failure to provide meal periods and pay missed meal period premiums (Cal Lab. Code §§ 227.7, 512); (5) failure to maintain accurate employment records (Cal. Lab. Code §§ 1174, 1174.5); (6) failure to pay wages timely during employment (Cal. Lab. Code §§ 200, 204); (7) failure to pay all wages earned and unpaid at separation (Cal. Lab. Code §§ 201-203); (8) failure to reimburse necessary business expenses (Cal. Lab. Code § 2802); (9) failure to furnish accurate itemized wage statements (Cal. Lab. Code § 226); (10) violation of the UCL (Cal. Bus. & Prof. Code §§ 17200, et seq.); and (11) PAGA penalties (Cal. Lab. Code § 2698 et seq.).  (See Holguin Action, ECF No. 1-1 at 1.)  On July 8, 2022, the Holguin Action was removed to the United States District Court for the Central District.  (See Holguin Action, ECF No. 1.)  On August 16, 2022, pursuant to the parties' stipulation, the Holguin Action was transferred to the United States District Court for the Eastern District (both actions together the "Action").  (See Holguin Action, ECF Nos. 16, 17, 18; see also Decl. Kane Moon Supp. Mot. Prel. Appr. ("Moon Decl.) ¶ 4, ECF No. 28-1 at 1.)

On October 31, 2022, pursuant to a notice of related cases, the Holguin Action was ordered related to the Ramirez Action, and the Holguin Action was reassigned to District Judge Ana de Alba, and Magistrate Judge Stanley A. Boone.  (See Holguin Action, ECF Nos. 22, 23.)

On January 24, 2023, Plaintiff filed the motion for preliminary approval of class action and PAGA settlement, and for certification for settlement purposes, in the Ramirez Action, and that is currently before the Court.  (Pls.' Mot. Prel. Appr. Settle ("Mot."), ECF No. 28.)  The

motion seeks approval of a settlement encompassing both the <u>Ramirez</u> Action and the <u>Holguin</u> Action.  On February 8, 2023, pursuant to a joint notice of settlement and request to stay that proffered the motion for preliminary approval in the <u>Ramirez</u> Action settles both actions, the Court stayed the <u>Holguin</u> Action until further order of the Court.  (See <u>Holguin</u> Action, ECF Nos. 27, 28.)

On August 25, 2023, pursuant to the consent of the parties, the <u>Ramirez</u> Action was reassigned to Magistrate Judge Stanley A. Boone for all purposes including trial and entry of judgment.  (ECF No. 34.)  On August 28, 2023, the Court held a status conference with the parties, and set a hearing on the motion for preliminary approval to be held on October 4, 2023, at 10:00 a.m., in Courtroom 9, before Magistrate Judge Stanley A. Boone.  (ECF Nos. 36, 37.)

The Court held a hearing on the motion for preliminary approval on October 4, 2023. Allen Feghali appeared on behalf of Plaintiffs and the putative class, and Diane O'Malley appeared on behalf of the Defendant.  (ECF No. 39.)  At the hearing, the Court expressed various concerns with the settlement agreement.  The Court ordered supplemental briefing on or before November 1, 2023.  (<u>Id.</u>)  On November 2, 2023, the Court granted a stipulated request to extend the deadline to file supplemental briefing for an additional forty-five (45) days.  (ECF No. 41.)

On November 7, 2023, pursuant to the parties' stipulation, the <u>Ramirez</u> Action and the <u>Holguin</u> Action were consolidated, with the <u>Ramirez</u> Action being the lead case, and the <u>Holguin</u> Action the member case.  (ECF No. 43.)

On December 13, 2023, Plaintiffs filed a supplemental brief containing an amended class and representative action settlement, an amended proposed order, and supplemental declarations addressing the issues the Court raised at the hearing.  Upon review of the supplemental materials, on December 14, 2023, the Court ordered additional supplemental declarations concerning any potential conflicts of interest with the proposed *cy pres* charity.  (ECF No. 45.)  On December 20, 2023, the Court received supplemental declarations from Plaintiff Ramona Holguin, Plaintiffs' counsel Jonathan Melmed, Plaintiffs' counsel Meghan Higday, Plaintiffs' counsel Kane Moon, Plaintiffs' counsel Mehrdad Bokhour, and Plaintiff Maria Ramirez.  (ECF Nos. 46-51.)  On December 27, 2023, the Court received supplemental declarations from Defendant's

counsel Alexa F. Galloway, and Senior Vice President and Chief Administrative Officer for Defendant, Morei Lingle.  (ECF Nos. 52. 53.)

### III.

### LEGAL STANDARD

The Ninth Circuit has recognized a strong judicial policy favoring settlement, particularly of complex class actions.  Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). Nevertheless, especially where settlement occurs prior to class certification, courts must scrutinize the proposed settlement to ensure the propriety of class certification and the fairness of the proposed settlement.  Staton v Boeing, 327 F.3d 938, 952 (9th Cir. 2003).

### A.     Certification of the Class

To certify a class, a party must demonstrate that all of the prerequisites of Rule 23(a), and at least one of the requirements of Rule 23(b) of the Federal Rules of Civil Procedure have been met.  Wang v. Chinese Daily News, Inc., 737 F.3d 538, 542 (9th Cir. 2013).  The district court must perform "a rigorous analysis" of each of the Rule 23(a) factors in determining whether the requirements of Rule 23 have been satisfied.  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); Ellis v. Costco Wholesale Corp., 657 F.3d 970, 979 (9th Cir. 2011); Wright v. Linkus Enterprises, Inc., 259 F.R.D. 468, 471 (E.D. Cal. 2009).

Under Rule 23(a), the four requirements that must be met for class certification are: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims for defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class."  Fed. R. Civ. P. 23(a)(1)-(4); Wright, 259 F.R.D. at 471.  These four requirements are referred to as "numerosity, commonality, typicality and adequacy of representation."  Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1028 (9th Cir. 2012); Bias v. Wells Fargo & Co., 312 F.R.D. 528, 534 (N.D. Cal. 2015).  "These requirements effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims' " by ensuring that the named plaintiffs have suffered the same injury and possess the same interest as the other class members.  Gen. Tel. Co. v. Falcon, 457 U.S. 147

1  (1982).

2    Under Rule 23(b), a plaintiff must establish one of the following conditions is present: (1)
3  that there is a risk of inconsistent adjudications from separate actions that would result in
4  incompatible standards of conduct for the party opposing the class or would be dispositive of the
5  interests of members not parties to the actions or would substantially impair their ability to
6  protect their interests; (2) the party opposing the class has acted or refused to act on grounds that
7  apply generally to the class, so that final injunctive or corresponding declaratory relief is
8  appropriate respecting the class as a whole; or (3) the court finds questions of law or fact
9  common to class members predominate over any questions affecting only individual members,
10  and a class action is superior to other methods of adjudicating the controversy.  Fed. R. Civ. P.
11  23(b)(1)-(3); Wright, 259 F.R.D. at 471-72.

12    In considering subsection three (3), "matters pertinent to these findings include: (A) the
13  class members' interests in individually controlling the prosecution or defense of separate
14  actions; (B) the extent and nature of any litigation concerning the controversy already begun by
15  or against class members; (C) the desirability or undesirability of concentrating the litigation of
16  the claims in the particular forum; and (D) the likely difficulties in managing a class action."
17  Fed. R. Civ. P. 23(b)(3)(A)-(D).  "The shared legal or factual issues must be of sufficient
18  importance to the case that the Court is convinced that the most efficient, fair, and sensible
19  method of adjudication is through a class action."  Bias v. Wells Fargo & Co., 312 F.R.D. 528,
20  534 (N.D. Cal. 2015).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes
21  are sufficiently cohesive to warrant adjudication by representation."  Hanlon v. Chrysler Corp.,
22  150 F.3d 1011, 1022 (9th Cir. 1998).  The Ninth Circuit has held that there is clear justification
23  to allow a representative action when "common questions present a significant aspect of the case
24  and they can be resolved for all members of the class in a single adjudication ...."  Mazza v. Am.
25  Honda Motor Co., 666 F.3d 581, 589 (9th Cir. 2012) (quoting Hanlon, 150 F.3d at 1022).

26    **B.    Court Approval of Class Settlement Agreements**

27    Federal Rule of Civil Procedure 23(e)(2) mandates that any settlement in a class action
28  may only be approved by the court after finding that the settlement is fair, reasonable, and

adequate after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;

> (B) the proposal was negotiated at arm's length;

> (C) the relief provided for the class is adequate, taking into account:

>> (i) the costs, risks, and delay of trial and appeal;

>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

>> (iv) any agreement required to be identified under Rule 23(e)(3); and

> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2)(A)-(D).   The role of the district court in evaluating the fairness of the settlement is not to assess the individual components, but to consider the settlement as a whole. Lane v. Facebook, Inc., 696 F.3d 811, 818-19 (9th Cir. 2012).   In reviewing a proposed settlement, the court represents those class members who were not parties to the settlement negotiations and agreement.   In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig., 295 F.R.D. 438, 448 (C.D. Cal. 2014).

## IV.

### THE PROPOSED SETTLEMENT AGREEMENT

**A.    Pre-Mediation Discovery and Mediation Leading to Settlement**

Plaintiffs proffer that prior to mediation, the parties engaged in analyzing data production, specifically, conducting significant investigation of the facts and law during the prosecution of this litigation.   (Moon Decl. ¶ 5.)   Plaintiffs state such investigation included informal written discovery; the pre-mediation exchange of information and voluminous data; and numerous communications between the Parties.   (Id.)   The parties further investigated the applicable law as applied to the alleged claims of Plaintiffs and potential defenses thereto, and

1  the damages claimed by Plaintiffs.  After reviewing documents regarding Defendant's wage and

2  hour policies and practices and other information obtained during the informal exchange of

3  discovery, Class Counsel were able to evaluate the probability of class certification, success on

4  the merits, and the reasonably obtainable maximum monetary exposure for all claims.  Class

5  Counsel reviewed these records and prepared a damage analysis, as well as the law applicable to

6  the claims and defenses, prior to mediation.  (Moon Decl. ¶ 6.)

7       On November 22, 2022, the parties participated in a day-long mediation before Steven

8  Rottman, who Plaintiffs proffer is a well-regarded mediator who has mediated many wage and

9  hour class actions.  (Moon Decl. ¶ 7.)  At the mediation, the parties discussed at length the

10  burdens and risks of continuing with the litigation as well as the merits of the claims and

11  defenses.  (Id.)  The parties agreed to the basic terms of a proposed settlement and ultimately

12  signed a long form settlement agreement.  Plaintiffs assert that Plaintiffs and Class Counsel are

13  aware of the burdens of proof necessary to establish liability for the claims asserted in the

14  actions, both generally and in response to Defendant's defenses thereto. (Moon Decl., ¶ 8.)

15  Plaintiffs and Class Counsel submit they have also taken into account Defendant's agreement to

16  enter into a settlement that confers substantial relief upon the Class.

17       **B.     The Settlement Terms as Modified After Initial Hearing**

18       Prior to the hearing, the Court reviewed the relevant terms of the proposed settlement

19  agreement that Plaintiffs submitted for preliminary approval.  (Joint Stip. Class & Rep. Action

20  Settle., ECF No. 28-1 at 25.)  In the supplemental materials, Plaintiffs have provided an amended

21  class and representative action settlement.   (Am. Joint Stip. Class & Rep. Action Settle.

22  (hereinafter the "Agreement"), ECF No. 28-1 at 25.)   The Court will highlight where the

23  supplemental briefing and amended agreement have addressed issues previously identified by the

24  Court.

25       1.     <u>The Actions Settled</u>

26       Under the Agreement, " 'Complaint' refers to the First Amended Complaint in *Ramirez*

27  *v. Merrill Gardens, LLC*, Case No. 1:22−CV−00542−ADA−SAB action filed June 15, 2022 and

28  the Class Action Complaint in *Holguin v. Merrill Gardens, LLC*, Case No. 1:22-CV-01042-SAB

1   action filed June 6, 2022, or any subsequent operative complaint at the time the Court grants

2   Preliminary Approval of this Settlement." (Agreement ¶ 1.)  Under the Agreement, and "[f]or

3   purposes of this Settlement, the matters, entitled *Ramirez v. Merrill Gardens, LLC*, Case No.

4   1:22-CV-00542-SAB (the "*Ramirez* matter") and *Holguin v. Merrill Gardens, LLC*, Case No.

5   1:22-CV-01042-SAB (the "*Holguin* matter"), are referred to herein as the 'Action.' "

6   (Agreement ¶ 2.)[1]

7           2.      <u>Primary Definitions in Settlement Agreement</u>

8           The "Class Period" is March 8, 2018, through the date upon which the Court grants

9   preliminary approval of the settlement.  (Agreement ¶ 3.)  The "Class" or "Class Members"

10  "consist of: All nonexempt employees of Defendant who worked for Defendant in California

11  during the Class Period." (Agreement ¶ 4.)  The "Settlement Class Members" are "those Class

12  Members who do not submit timely exclusion requests to the Settlement Administrator."  (<u>Id.</u>)

13  According to the Agreement, the "Parties' best estimate as of October 2022 is that the Class

14  includes approximately 3,780 individuals who worked 219,646 workweeks.  (<u>Id.</u>)

15          "Class Counsel" means Moon Law Group, PC, Melmed Law Group P.C. and Bokhour

16  Law Group, P.C.  (Agreement ¶ 5.)[2]

17          "Covered Workweeks" is defined as "the number of weeks a Class Member worked at

18  Defendant's locations in California during the Class Period." (Agreement ¶ 6.)

19          "Net Settlement Amount" is defined as "the amount calculated by deducting from the

20  Gross Settlement Amount the following sums: (1) Plaintiffs' attorneys' fees; (2) Plaintiffs'

21  reasonable litigation costs; (3) the Service Payment to the named Plaintiffs; (4) the PAGA

22  Penalty Payment to the Labor and Workforce Development Agency (the "LWDA"); and (5)

23  costs of settlement administration.  (Agreement ¶ 10.)

24          "PAGA Allocation" is defined as "the portion of the Gross Settlement Amount that the

25

26  [1] Prior to the hearing, the <u>Holguin</u> Action was still assigned to a District Judge.  Following the discussion at the
     hearing, the parties filed consent forms in the <u>Holguin</u> Action, and consolidated the actions and updated the
27  Agreement to reflect the correct case numbers.

28  [2] The Court notes the previous settlement agreement stated Class Counsel included Moon & Yang, APC, rather than
     Moon Law Group, PC.  (<u>See</u> ECF No. 28-1 at 27.)

Parties have agreed to allocate to resolution of the Released PAGA Claims." (Agreement ¶ 11.) The Agreement provides that the "PAGA Allocation will be $85,000 from the Gross Settlement Amount," and "Seventy Five Percent (75%), or $63,750, of the PAGA Allocation will be paid to the LWDA (the 'PAGA Penalty Payment'), and Twenty Five Percent (25%), or $21,250, of the PAGA Allocation will be included in the Net Settlement Amount for PAGA Employees (the 'PAGA Settlement Payment')." (Id.)

"PAGA Period" is "the period between February 19, 2021 through the date upon which the Court grants preliminary approval." (Agreement ¶ 12.) "PAGA Employee" means "all Class Members that worked during the PAGA Period . . . [and] all PAGA Employees are 'aggrieved employees' as defined pursuant to PAGA." (Agreement ¶ 13.) "PAGA Pay Periods" means "the number of pay periods each PAGA Employee worked during the PAGA Period." (Agreement ¶ 14.) "PAGA Representatives" means "Plaintiffs." (Agreement ¶ 15.)

The "Released PAGA Claims" means "all claims that have been pled or could have been pled, based upon the factual allegations and issues set forth in the Notice to the LWDA and alleged in the Complaint, including civil penalties under PAGA, fees, and all other claims and allegations made or which could have been made in the Action based on the facts and allegations pled in Plaintiff [Ramirez's] Notice to the LWDA and the Complaint." (Agreement ¶ 16.)

"Settlement Payments" means "all of the payments to Settlement Class Members (the 'Settlement Class Payments') and all of the payments to PAGA Employees (the 'PAGA Settlement Payment')." (Agreement ¶ 17.)

3. Additional Terms of the Settlement Agreement

"Solely for purposes of settling this case, the Parties and their respective counsel stipulate and agree that the requisites for establishing class certification with respect to the Class Members have been met and are met." (Agreement ¶ 19.) Defendant will pay a maximum Gross Settlement Amount of $825,000.00, resulting in an estimated average gross payment per Class Member of about $218.25. (Agreement ¶ 26(c); Mot. 10, 26.) The settlement is based on an estimate of approximately 3,780 individual Settlement Class Members, and approximately 219,646 work weeks worked by the Settlement Class Members as of October 2022. (Agreement

¶ 4; Mot. 10; Moon Decl., ¶ 35.)

The settlement is non-reversionary and no portion of the Gross Settlement Amount will revert to Defendant.  (Agreement ¶ 26(e).)  The parties have agreed that "[r]emaining funds will be distributed to the Parties' proposed *cy pres*: Legal Aid at Work, a non-profit organization committed to advocating for employees' rights and which provides legal services to low-income communities, located at 180 Montgomery St., Suite 600, CA 94104, https://legalaidatwork.org/, in accordance with California Code of Civil Procedure section 384."  (Agreement ¶ 26(e).)[3]

"Class Members will not be required to submit a claim to receive their Settlement payment.  (Agreement ¶ 26(f); Mot. 10.)

Under the Class Release, the settlement will release specified wage-and-hour claims for Settlement Class Members (those Class Members who do not timely opt out of the Settlement).  (Mot. 10; Agreement ¶¶ 4, 37.)  The Class Members will also release the PAGA Claims in the Action, that were identified in the Complaint and Plaintiff's LWDA Notice Letter, regardless of whether they opt out of the class portion of the Settlement."  (Mot. 11; Agreement ¶¶ 16, 37.)

The "Net Settlement Amount" available to the Class is estimated to be at least $411,250.00 resulting in an average net payment per Class Member of at least $108.80, before any tax withholdings (excluding the aggrieved employees' share of PAGA penalties)."  (Mot. 11; Agreement ¶ 26(g).)  This is the result "[a]fter deducting Class Counsels' attorneys' fees and costs, service payments to Plaintiffs, estimated Administration costs, and the payment to the LWDA."  (Id.)

The Agreement, as revised following the hearing,[4] provides that "[e]ach Settlement Class Member will be paid a pro-rata share of the Net Settlement Amount (less the PAGA Settlement

---

[3]  The parties previously had agreed to disburse the remaining funds to the Children's Advocacy Center, an organization committed to assisting children who are victims of physical or sexual abuse, or who have witnessed acts of violence, located at 1650 E. Old Badillo St. #C3, Covina, CA. 91724, http://childrensadvocacyctr.org/, in accordance with California Code of Civil Procedure section 384.  (See ECF No. 28-1 at 33.)  At the hearing the Court inquired whether such organization was an appropriate *cy pres* recipient, and the parties have now changed such *cy pres* recipient.  The Court discusses whether the change is sufficient under Ninth Circuit law below.

[4]  The settlement agreement initially filed with the Court prior to the hearing provided that "[t]he pro-rata share will be determined by comparing the individual Settlement Class Member's Covered Workweeks employed during the Class Period in California to the total Covered Workweeks of all the Settlement Class Members during the Class Period."  (ECF No. 28-1 at 34.)  Thus, the pro-rata share is now calculated based on hours, not workweeks.

1  Payments totalling [sic] $21,250.00), as calculated by the Settlement Administrator," and that

2  "[t]he pro-rata share will be determined by comparing the individual Settlement Class Member's

3  total number of hours worked in the Class Period to the sum number of hours worked in by all

4  the Settlement Class Members during the Class Period." (Agreement ¶ 26(i); see also ECF No.

5  44-1 at 4.)

6  As for allocation of taxes, "[o]ne-third (1/3) of all Settlement Class Payments to

7  Settlement Class Members shall be considered wages and shall be subject to the withholding of

8  all applicable local, state and federal taxes, and two-thirds (2/3) of all Settlement Class Payments

9  to Settlement Class Members shall be considered non-wages for the settlement of interest claims,

10  liquidated damages, and statutory and civil penalty claims." (Mot. 11; Agreement ¶ 26(k).)

11  However, the PAGA Settlement Payment shares to PAGA Employees will be entirely allocated

12  to penalties. (Mot. 11; Agreement ¶ 26(j).)

13  Further, the employer Defendant's portion of payroll taxes (e.g., FICA, FUTA, etc.)

14  owed on any settlement payments to Class Members that constitute wages will be paid separate

15  and apart from the Gross Settlement Amount. (Mot. 11-12; Agreement ¶ 26(h).)

16  The notice portion of the Settlement will be administered by a third-party Administrator,

17  ILYM Group, Inc., and actual costs of administration are estimated to be $30,000.00.

18  (Agreement ¶ 26(p).)

19  The Agreement provides for Class Representative Service Payments of up to $7,500 for

20  each Plaintiff (for a total of $15,000.00), to be paid from the GSA. (Agreement ¶ 26(g).)

21  Defendant will not object to Class Counsel's application for attorneys' fees not to exceed 33

22  1/3% of the GSA ($275,000.00), and reimbursement of actual costs, in an amount not to exceed

23  $30,000, to be paid out of the GSA. (Agreement ¶ 26(m).)

## V.

## ANALYSIS AND DISCUSSION

26  District courts review class action settlements in two stages. First, as here, where a

27  plaintiff files a motion described as a motion for preliminary approval, along with a motion to

28  certify the class for purposes of settlement, if certification has not occurred. If the district court

grants preliminary approval and certifies the class, class members are then notified and given an opportunity to object to the settlement or opt-out of the settlement.  See Cotter v. Lyft, Inc., 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016).  Thereafter, plaintiffs typically file a motion for final approval, and after a final fairness hearing and considering any objections to the settlement, the district court determines whether to grant final approval.  Id.

Even where a proposed settlement is unopposed, the Court must fully examine whether the proposed settlement class satisfies Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation.  Wright, 259 F.R.D. at 472 (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir.1998)).  The Ninth Circuit and Supreme Court have emphasized that Rule 23(e) governing settlement is an additional, not a superseding requirement, and thus "just because a settlement appears to be fair, reasonable, and adequate under Rule 23(e) does not mean a class has met the certification requirements of Rule 23(a) and (b)."  In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 942 (9th Cir. 2015) (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620–21 (1997)).

This action is currently at the first stage where the Court shall consider whether preliminary approval of the proposed settlement is appropriate, and whether the class should be certified for purposes of settlement only.  The Court now turns to determine whether certification of the class is appropriate for purposes of settlement.

### A.   Certification of the Class for Purposes of Settlement

Again, the Class consists of : "All non-exempt employees of Defendant who worked for Defendant in California during the Class Period," with the Class Period defined as March 8, 2018, through the date upon which the Court grants preliminary approval of the settlement. (Agreement ¶¶ 3-4.)

1.   Numerosity

Numerosity is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  There is no absolute number or cut-off for determining numerosity, and the specific facts of each case may be examined.  Schwarm v. Craighead, 233 F.R.D. 655, 660 (E.D. Cal. 2006); Cervantez v. Celestica Corp., 253 F.R.D. 562, 569 (C.D. Cal.

1   2008).   "A reasonable estimate of the number of purported class members satisfies the

2   numerosity requirement of Rule 23(a)(1)."   In re Badger Mountain Irr. Dist. Sec. Litig., 143

3   F.R.D. 693, 696 (W.D. Wash. 1992); see also Cervantez, 253 F.R.D. at 569 ("Courts have not

4   required evidence of specific class size or identity of class members to satisfy the requirements

5   of Rule 23(a)(1).").

6         The proposed class, as of October of 2022, consisted of approximately 3,780 individuals.

7   (Mot. 18-19; Agreement ¶ 4; Moon Decl. ¶ 35.)   The Court finds the proposed class of 3,780

8   members satisfies the numerosity requirement as joinder of such members is impracticable.   See

9   Celano v. Marriott Int'l, Inc., 242 F.R.D. 544, 549 (N.D. Cal. 2007) (noting "courts generally

10   find that the numerosity factor is satisfied if the class comprises 40 or more members and will

11   find that it has not been satisfied when the class comprises 21 or fewer."); Cervantez, 253 F.R.D.

12   at 569 ("Courts have held that numerosity is satisfied when there are as few as 39 potential class

13   members.").

14         2.   Commonality

15         Commonality is satisfied where "there are questions of law or fact common to the class."

16   Fed. R. Civ. P. 23(a)(2).   The Ninth Circuit has stated that Rule 23(a)(2) is construed

17   permissively and that "[a]ll questions of fact and law need not be common to satisfy the rule."

18   Staton, 313 F.3d at 462 (quoting Hanlon, 150 F.3d at 1019).   Indeed, "[t]he existence of shared

19   legal issues with divergent factual predicates is sufficient, as is a common core of salient facts

20   coupled with disparate legal remedies within the class."   Id.   "[T]he key inquiry is not whether

21   the plaintiffs have raised common questions," but "whether class treatment will 'generate

22   common answers apt to drive the resolution of the litigation.' "   Arredondo v. Delano Farms Co.,

23   301 F.R.D. 493, 503 (E.D. Cal. Feb. 21, 2014) (citations omitted).   Commonality is not required

24   for all of the claims.   It may sufficient if there is one single issue common to the proposed class.

25   Dukes, 564 U.S. at 359 (stating that even a single common question will satisfy Rule 23(a)(2));

26   True v. American Honda Motor Co., 749 F.Supp.2d 1052, 1064 (C.D. Cal. 2010); Haley v.

27   Medtronic, Inc., 169 F.R.D. 643, 648 (C.D. Cal. 1996) ("Indeed, for the commonality

28   requirement to be met, there must only be one single issue common to the proposed class."); see

1    also In re Paxil Litig., 212 F.R.D. 539, 549 (C.D. Cal. 2003) (noting that "the commonality
2    requirement is interpreted to require very little").

3         Plaintiffs argue that all Class Members have shared a common interest in determining:
4    whether Defendant provided legally compliant meal periods and rest breaks to Class Members;
5    whether Defendant paid employees for all time worked; whether Defendant violated the itemized
6    wage statement provisions of Labor Code § 226 by not providing accurate information as to
7    wages; whether Defendant reimbursed employees necessary business expenses; whether
8    Defendant's policies and practices violated California Business & Professions Code §§ 17200 *et*
9    *seq.*; and whether Defendant's policies and practices violated PAGA.  (Mot. 19.)

10        While not extensively argued in the motion, given the permissive standards for
11   establishing commonality, the Court has found sufficient support in the moving papers, the
12   representative Plaintiffs' declarations, and the operative complaints.  The Court concludes the
13   facts and legal issues underlying the action are sufficiently similar for the Class Members, and
14   that Plaintiffs have demonstrated commonality as they have sufficiently shown that they suffered
15   common injuries that are capable of resolution on a class-wide basis.  See Dukes, 564 U.S. at
16   350; Millan v. Cascade Water Servs., Inc., 310 F.R.D. 593, 612 (E.D. Cal. 2015).

17        3.   Typicality

18        Rule 23 also requires that "the claims or defenses of the representative parties are typical
19   of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Under the rule's permissive
20   standard, claims "need not be substantially identical," but are typical if the representative's
21   claims are "reasonably co-extensive with those of the absent class members."  Parsons v. Ryan,
22   754 F.3d 657, 685 (9th Cir. 2014) (quoting Hanlon, 150 F.3d at 1020).  Typicality is based on the
23   "nature of the claim or defense of the class representative, and not to the specific facts from
24   which it arose or the relief sought."  Parsons, 754 F.3d at 685 (quoting Hanon v. Dataproducts,
25   976 F.2d at 508).  Typicality tests "whether other members have the same or similar injury,
26   whether the action is based on conduct which is not unique to the named plaintiffs, and whether
27   other class members have been injured by the same course of conduct."  Id.  The requirements of
28   commonality and typicality occasionally merge, and "[b]oth  serve as guideposts for determining

1   whether under the particular circumstances maintenance of a class action is economical and

2   whether the named plaintiff's claim and the class claims are so interrelated that the interests of

3   the class members will be fairly and adequately protected in their absence."  Parsons, 754 F.3d at

4   685 (quoting Wal-Mart Stores, Inc., 564 U.S. at 349 n.5).

5       Plaintiffs do not extensively detail support for this factor, only stating: "Plaintiffs are

6   raising the same claims as the putative class members and have alleged no other individual

7   claims in this matter."  (Mot. 21, citing Moon Decl., ¶ 37; Decl. Maria Bustos Ramirez Supp.

8   Mot. ("Ramirez Decl.") ¶¶ 5-11, ECF No. 28-3 at 1; Decl. Ramona Holguin Supp. Mot.

9   ("Holguin Decl.") ¶ 8, ECF No. 28-1 at 1.)[5]

10      Based on review of evidence, counsel determined Defendant's policies and practices are

11  either identical or sufficiently similar to raise the same questions of liability as applied to all

12  Class Members.  (Moon Decl. ¶ 37.)

13      Holguin was employed by Defendant as a caregiver during a relevant time period.

14  (Holguin Decl. ¶ 1.)  Holguin declares that: Defendant maintained a policy that the Class and she

15  was required to remain on duty during our rest periods; Defendant often did not provide the

16  required rest breaks, and instead had employees work through rest breaks; Defendant required

17  the Class and her to be available at all times to respond to communication by telephone,

18  including during rest periods; that Defendant had a policy and practice of understaffing the

19  various posts that often made it difficult for the Class and her to take rest periods; Defendant's

20  policy and practice of understaffing also often made it difficult for the Class and her to take meal

21  breaks, with Class Members and her often missing or being interrupted during meal breaks;

22  Defendant required the Class and her to not leave the premise during meal breaks so to be

23  available if needed; Defendant failed to compensate the Class and her with one-hour worth of

24  premium pay at the regular rate of compensation when not provided with compliant meal or rest

25  periods; Defendant required her to be available by telephone and use her personal cell phone for

26  work, but failed to reimburse for personal cell phone usage; Defendant failed to provide accurate

27

28  _____
    [5]  It appears Plaintiffs meant to cite to more than just paragraph 8 of the Holguin declaration.

itemized wage statements to the Class and her showing gross wages earned, total hours worked, net wages earned, and all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate, since the rest break premiums were never included on the wage statements, or with any final paychecks for final wages.  (Holguin Decl. ¶ 5-9.)  Holguin further declares that she has no conflict with the members of the Class, that she shares the same claims as the putative class members, and has alleged no other individual claims.  (Holguin Decl. ¶ 11.)

Ramirez declares that she began working as a cook for Defendant on July 8, 2020; that meal and rest periods are sometimes interrupted, late or missed; that she is not reimbursed for the use of her personal cell phone for work purposes, and is not paid for all hours worked for Defendant due to pre-shift and post-shift activities; that she was an hourly non-exempt employee of Defendant and was subject to the same pay structure and rules as all the other hourly non-exempt employees of Defendant; that she is not aware of anything special about her that would raise unique defenses to her claims, as opposed to the claims of the class; that she is not suing for anything unique to her; and that her claims are based upon the same facts that relate to the rest of the Class.  (Ramirez Decl. ¶¶ 4, 9-10.)

Based on a review of the moving papers, the Agreement, the operative complaints, and the above summarized declarations, the Court finds for purposes of preliminary certification and settlement that Plaintiffs have sufficiently demonstrated there are claims that are typical to the class.  See Millan, 310 F.R.D. at 605 (finding typicality satisfied based on the presence of at least one shared claim, the failure to pay overtime claim, and noting "[a]lthough potentially different in extent and frequency from the putative class members, Plaintiff appears to have suffered the same injury—under payment for overtime—as the putative class.").[6]

/ / /

---

[6]  The Court shares a similar concern as the Millan court that noted concern "about the lack of information regarding the injuries that putative class members may have suffered [as] [i]f putative class members suffered broader injuries than the named plaintiff, the compensation awarded may not justify the scope of the release."  Millan, 310 F.R.D. at 606 n.8 ("In other words, putative class members may be releasing claims that they are not compensated for by the settlement award.").  However, "for purposes of preliminary certification, the Court has seen no indication that the named plaintiff's injuries are atypical of the class."  Id.

1        4.      Adequacy of Representation

2        The Court must ensure "the representative parties will fairly and adequately protect the

3    interests of the class." Fed. R. Civ. P. 23(a)(4).  In determining whether the named plaintiffs will

4    adequately represent the class, the courts must resolve two questions: "(1) do the named

5    plaintiffs and their counsel have any conflicts of interest with other class members and (2) will

6    the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

7    Ellis, 657 F.3d at 985 (quoting Hanlon, 150 F.3d at 1020).  "Adequate representation depends

8    on, among other factors, an absence of antagonism between representatives and absentees, and a

9    sharing of interest between representatives and absentees." Ellis, 657 F.3d at 985 (citing Molski

10   v. Gleich, 318 F.3d 937, 955 (9th Cir.2003)).  Class representatives "must be part of the class

11   and possess the same interest and suffer the same injury as the class members."  Amchem Prod.,

12   521 U.S. at 626 (internal quotations and citations omitted).  This factor also tends to merge with

13   the commonality and typicality criteria of Rule 23.  Id. at 626 n.20.

14       Here, Plaintiffs argue there are no conflicts of interest between Plaintiffs and Class

15   Members, and Plaintiffs have both shown and expressed their willingness to represent Class

16   Members.  (Ramirez Decl. ¶¶ 5-11; Holguin Decl. ¶¶ 11-12.)  Plaintiffs argue the similarity of

17   the claims asserted and remedies sought by Class Members and Plaintiffs do not suggest any

18   divergent interests held by Plaintiffs, and that Defendant did not assert unique defenses against

19   Plaintiffs that it could not assert against any other Class Member.  Finally, Plaintiffs also contend

20   there are no conflicts with Plaintiffs' counsel, and that counsel have substantial class action

21   experience and can adequately represent the Class, having been appointed class counsel in many

22   wage and hour class actions against major employers.  (Moon Decl. ¶¶ 21-26; Decl. Jonathan

23   Melmed Supp. Mot. ("Melmed Decl.") ¶¶ 5-8, ECF No. 28-6 at 1; Decl. Mehrdad Bokhour

24   Supp. Mot. ("Mehrdad Decl.") ¶¶ 6-7, ECF No. 28-5 at 1.)

25       In accord with the findings regarding commonality and typicality discussed above, the

26   Court finds Plaintiffs share common injuries and possess the same interest as the unnamed class

27   members.  Plaintiffs do not have any discernible interests that are antagonistic to the class.

28   Further, based on review of the submitted declarations, the Court finds Plaintiffs' counsel have

1  demonstrated that they have sufficient experience handling employment class actions and
2  complex wage-and-hour litigation.

3       Accordingly, the Court finds that Plaintiffs and their counsel have demonstrated they will
4  adequately and fairly protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).

5       5.   <u>Rule 23(b) Criteria</u>

6       Plaintiffs must also meet one of the three subdivisions of Rule 23(b) to certify the class.
7  Fed. R. Civ. P. 23(b).  Plaintiffs argue the proposed class meets the requirements of Rule
8  23(b)(3).  Under Rule 23(b)(3) a class action may proceed where "the court finds that the
9  questions of law or fact common to class members predominate over any questions affecting
10  only individual members, and that a class action is superior to other available methods for fairly
11  and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Matters pertinent to this
12  determination include: "(A) the class members' interests in individually controlling the
13  prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning
14  the controversy already begun by or against class members; (C) the desirability or undesirability
15  of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties
16  in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)-(D).  The fact that the parties have
17  reached a settlement is relevant to consideration of these factors and when "[c]onfronted with a
18  request for settlement-only class certification, a district court need not inquire whether the case,
19  if tried, would present intractable management problems [under Rule 23(b)(3)(D)], for the
20  proposal is that there be no trial."  <u>Amchem Prod.</u>, 521 U.S. at 620.  However, "other
21  specifications of the Rule—those designed to protect absentees by blocking unwarranted or
22  overbroad class definitions—demand undiluted, even heightened, attention in the settlement
23  context."  <u>Id.</u>

24       Here, Plaintiffs argue there are common issues that may predominate over individual
25  issues in this litigation, including: (1) whether Defendant uniformly failed to provide Class
26  Members with legally compliant meal periods and rest breaks; (2) whether Defendant required or
27  permitted employees to work off the clock; (3) whether Defendant paid split shift premiums and
28  included all remuneration paid to employees in calculation of meal premiums, sick pay and

1   overtime; (4) whether Defendant provided putative Class Members with itemized wage

2   statements that were inaccurate in violation of Labor Code § 226; (5) whether Defendant

3   reimbursed employees for necessary business expenses, and (5) whether Defendant failed to pay

4   all overtime wages due and payable to former employees within the times specified under the

5   California Labor Code.  (Mot. 20.)

6       Plaintiffs argue the factors articulated in Rule 23(b)(3)(A), (B) and (C) favor class

7   certification, as: it is difficult to believe that any Class Members have an interest in individually

8   controlling the prosecution of separate actions, given the relatively small sums involved for any

9   one Class Member; that any Class Member who wants to pursue a separate action can opt out of

10  the settlement; and that it is desirable to concentrate the issues in this forum, with the settlement

11  allowing all individuals to resolve similar claims against Defendant through a process that does

12  not even require the submission of a claim form.

13      Plaintiffs argue this case is similar to Las Vegas Sands, in that the "case involves multiple

14  claims for relatively small sums" and "[i]f plaintiffs cannot proceed as a class, some-perhaps

15  most—will be unable to proceed as individuals because of the disparity between their litigation

16  costs and what they hope to recover."  Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v.

17  Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir. 2001).  In other words., a class action "may

18  permit the plaintiffs to pool claims which would be uneconomical to litigate individually."  Id.

19  (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985)).

20      The Court agrees the relatively small recoverable individual sums and other above

21  considerations weigh in favor of finding the "class action is superior to other available methods

22  for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); Las Vegas

23  Sands, 244 F.3d at 1163.  Given the common claims pertaining to the Class Members as current

24  and former employees subject to the same policies, the Court finds questions of law or fact

25  common to class members predominate over any questions affecting only individual members.

26  Given the difficulties of pursuing individual claims in this context, "the class members' interests

27  in individually controlling the prosecution or defense of separate actions" is outweighed by the

28  "desirability . . . of concentrating the litigation of the claims" in this forum, and there is no

1    indication of other "litigation concerning the controversy already begun by or against class

2    members." Fed. R. Civ. P. 23(b)(3)(A)-(C).  The Court need not weigh potential difficulties in

3    managing the class action given the parties have reached settlement.  Amchem Prod., 521 U.S. at

4    620.  Therefore, the Court also finds that a class action is the superior method for adjudicating

5    the claims in this action.

6         Accordingly, the Court finds Plaintiffs have sufficiently met the requirements of Rule

7    23(b)(3), and that class may be certified for purposes of settlement.

8         **B.    Whether the Proposed Settlement is Fair, Reasonable, and Adequate**

9         As stated above, Federal Rule of Civil Procedure 23(e)(2) mandates that any settlement in

10   a class action may only be approved by the court after finding that the settlement is fair,

11   reasonable, and adequate after considering whether:

12
             (A) the class representatives and class counsel have adequately
13           represented the class;

14           (B) the proposal was negotiated at arm's length;

15           (C) the relief provided for the class is adequate, taking into
             account:

16               (i) the costs, risks, and delay of trial and appeal;

17               (ii) the effectiveness of any proposed method of
                 distributing relief to the class, including the method of
18               processing class-member claims;

19               (iii) the terms of any proposed award of attorney's fees,
                 including timing of payment; and
20
                 (iv) any agreement required to be identified under Rule
21               23(e)(3); and

22           (D) the proposal treats class members equitably relative to each
             other.
23
     Fed. R. Civ. P. 23(e)(2)(A)-(D); Hanlon, 150 F.3d at 1026.
24
          The role of the district court in evaluating the fairness of the settlement is not to assess
25
     the individual components, but to consider the settlement as a whole.  Lane v. Facebook, 696
26
     F.3d at 818-19.  "Assessing a settlement proposal requires the district court to balance a number
27
     of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration
28

of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." Hanlon, 150 F.3d at 1026 (citing Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993)).

"To determine whether a settlement falls within the range of possible approval, a court must focus on substantive fairness and adequacy, and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." Lusby v. Gamestop, Inc., 297 F.R.D. 400, 415 (N.D. Cal. 2013) (quoting In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007)). "If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing." In re Tableware Antitrust Litigation, 484 F. Supp. 2d at 1079 (quoting Manual for Complex Litigation, Second § 30.44 (1985)).

When the settlement takes place before formal class certification, as it has in this instance, settlement approval requires a "higher standard of fairness." Lane v. Facebook, Inc., 696 F.3d at 819 (quoting Hanlon, 150 F.3d at 1026). This more exacting review of class settlements reached before formal class certification is required to ensure that the class representatives and their counsel do not receive a disproportionate benefit "at the expense of the unnamed plaintiffs who class counsel had a duty to represent." Id. As recently emphasized by the Ninth Circuit, this requires courts to apply "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." Roes, 1-2 v. SFBSC Mgmt., LLC, 944 F.3d 1035, 1043 (9th Cir. 2019) (quoting In re Bluetooth, 654 F.3d at 946). When reviewing a district court's final approval of a settlement negotiated prior to certification, the Ninth Circuit ensures the district court: (1) comprehensively explored all factors; (2) has given a reasoned response to all non-frivolous objections; (3) adequately developed the record to support its final approval decision; and (4) "looked for and scrutinized

any subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." Roes, 944 F.3d at 1043 (quoting Allen v. Bedolla, 787 F.3d 1218, 1223 (9th Cir. 2015)).

1.      The Court finds the Class Representatives and Counsel have Adequately Represented the Class, the Proposal was Negotiated at Arm's Length Following Mediation, and Such Factors Weigh in Favor of Granting Preliminary Approval

Here, Plaintiffs argue the parties have entered a non-collusive settlement after discovery and extended negotiations; that the settlement was finally reached after a day of arm's length negotiations before Steve Rottman, a highly-respected mediator skilled at helping parties attempting to negotiate reasonable settlements in wage and hour class actions; that obtaining class certification and establishing liability posed significant hurdles for the class that justified the settlement; and that the Stipulation falls within the range of reasonable outcomes and merits approval under Rule 23(e).  (Mot. 24; Moon Decl., ¶¶ 8-9, 11, 13-20; Melmed Decl., ¶¶ 11-14, 16, 19.)

Plaintiffs first contend that where a settlement results from arms-length negotiations following relevant discovery, there is a presumption that the agreement is fair, (Mot. 24-25).  See Linney v. Cellular Alaska Partnership, 1997 WL 450064, *5 (N.D. Cal. 1997); see also Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair," and "[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.") (internal quotations and citations omitted).

However, the Ninth Circuit has instead emphasized that this is not a valid presumption, particularly where, like here, settlement is negotiated prior to class certification:

> Nowhere in the final approval order, however, did the district court cite or otherwise acknowledge our longstanding precedent requiring a heightened fairness inquiry prior to class certification. To the contrary, the district court declared that, "[w]here a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a *presumption that the settlement is fair and reasonable*." (Emphasis added.)  But such a presumption of fairness is not

supported by our precedent, and the district court cites no Ninth Circuit case which adopted this standard.  Particularly in light of the fact that we not only have never endorsed applying a broad presumption of fairness, but have actually required that courts do the opposite—by employing extra caution and more rigorous scrutiny—when it comes to settlements negotiated prior to class certification, the district court's declaration that a presumption of fairness applied was erroneous, a misstatement of the applicable legal standard which governs analysis of the fairness of the settlement.

Roes, 944 F.3d at 1049; see also Saucillo v. Peck, 25 F.4th 1118, 1130–31 (9th Cir. 2022) ("We did not announce a new rule in Roes, but rather reiterated a number of our previous holdings . . . [and rather] noted that we had adopted this rule to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent.") (internal quotation marks and citations omitted); City of Long Beach v. Monsanto Co., No. CV 16-3493 FMO (ASX), 2020 WL 10540857, at *1 (C.D. Cal. July 13, 2020) ("[T]o the extent plaintiffs rely on a presumption of fairness . . . it would be contrary to controlling authority." (citing Roes, 944 F.3d at 1049)); c.f. Canava v. Rail Delivery Servs. Inc., No. 2:19-CV-00401-SB-KK, 2022 WL 18359143, at *2 (C.D. Cal. Dec. 2, 2022) ("At the preliminary stage, after a class has been certified, there is an "initial presumption of fairness." (quoting In re Tableware, 484 F. Supp. 2d at 1079)).

Thus, the Court's review does not begin with a *presumption* of fairness based on apparent arms-length negotiations.  Id.  Nonetheless, it is still a factor that may appropriately weigh in favor of finding the proposed settlement is fair, reasonable, and adequate.  See Fed. R. Civ. P. 23(e)(2)(A) (whether "the class representatives and class counsel have adequately represented the class"); Fed. R. Civ. P. 23(e)(2)(B) (whether "the proposal was negotiated at arm's length").

While a more exacting standard applies at final approval, the Court reiterates that it is mindful that the Ninth Circuit holds "district courts to a 'higher procedural standard when making th[e] determination of substantive fairness," with "[t]hat procedural burden [] more strict when a settlement is negotiated absent class certification."  Roes, 944 F.3d at 1043 (quoting Allen, 787 F.3d at 1223.  "In such cases, the district court abuses its discretion if it fails to apply 'an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is

1    ordinarily required under Rule 23(e).' " Roes, 944 F.3d at 1043 (quoting In re Bluetooth, 654

2    F.3d at 946).

3         Based on review of the course of litigation in this matter, the mediation,[7] the counsel's

4    declarations describing settlement and valuation of the claims as detailed in the following

5    section, and the class representative's work in this matter as described in their declarations, the

6    Court finds that the class representatives and counsel have adequately represented the class and

7    the proposal was negotiated at arm's length, and these factors weigh in favor of finding the

8    settlement agreement is fair, reasonable, and adequate.  See Fed. R. Civ. P. 23(e)(2)(A)-(B).

9              2.    The Relief Provided the Class is Adequate

10        In determining whether the relief provided to the class is adequate, the Court is to take

11   into account: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any

12   proposed method of distributing relief to the class, including the method of processing class-

13   member claims; (iii) the terms of any proposed award of attorney's fees, including timing of

14   payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P.

15   23(e)(2)(C)(i)-(iv).

16            a.    The Costs, Risks, and Delay of Trial and Appeal

17        Relatedly, Plaintiffs argue the parties reached the settlement in good faith after

18   negotiating at arm's length with a professional mediator, with settlement only occurring after

19   documents and information was shared prior to mediation (including detailed time records for a

20   sample of putative class members), with the information produced being sufficient to permit

21   Plaintiff's counsel to adequately evaluate the settlement.  The Court now turns to review the

22   damages and valuation analysis, in relation to the costs, risks, and potential delay of trial and

23   appeal.

24   _____

25   [7] While not a presumption, the assistance of a mediator in negotiating the settlement supports a determination that
     the settlement was negotiated at arm's length and is non-collusive.  See Millan, 310 F.R.D. at 613 (stating
26   participation in mediation supports determination that settlement process was not collusive); Villegas v. J.P. Morgan
     Chase & Co., No. CV 09-00261 SBA EMC, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (stating that the
27   fact settlement was reached following two sessions with a private mediator experienced in wage and hour class
     action "tend[ed] to support the conclusion that the settlement process was not collusive."); Satchell v. Fed. Express
28   Corp., No. C 03 2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced
     mediator in the settlement process confirms that the settlement is non-collusive.").

"To determine whether a settlement 'falls within the range of possible approval' a court must focus on 'substantive fairness and adequacy,' and 'consider plaintiffs' expected recovery balanced against the value of the settlement offer.' " Collins v. Cargill Meat Sols. Corp., 274 F.R.D. 294, 302 (E.D. Cal. 2011) (quoting In re Tableware Antitrust Litig., 484 F.Supp.2d at 1080).

The Court agrees with Plaintiffs that counsel reasonably identified and relied on significant risks that support the reduced compromise settlement amount. These risks include: (1) the potential that Plaintiffs would be unable to establish liability for allegedly unpaid straight time or overtime wages, Duran v. US Bank Nat'l Ass'n, 59 Cal. 4th 1, 39 & n.33 (2014) (citing Dilts v. Penske Logistics, LLC, 2014 WL 205039 (S.D. Cal. 2014) (dismissing certified off-the-clock claims based on proof at trial)); (2) the risk Defendant's challenged employment policies might not ultimately support class certification or a class-wide liability finding, Duran, 59 Cal. 4th at 14 & n.28; (3) the risk that uncertainties pertaining to the ultimate legality of Defendant's policies and practices could preclude class-wide awards of statutory penalties under Labor Code §§ 203 and 226(e); (4) the risk that individual differences between Settlement Class Members could be construed as pertaining to liability, and not solely to damages, Duran, 59 Cal. 4th at 19; (5) the risk that any civil penalties award under the PAGA could be reduced substantially by the Court in its discretion, Cal. Labor Code § 2699(e)(1)[8]; (6) the risk that class treatment could be deemed improper due to the dispute resolution agreements executed by employees or the risk that class treatment could be deemed improper as to one or more claims except for settlement purposes; (7) the risk that lengthy appellate litigation could ensue, and (8) the risk that differences in the work experiences of employees assigned to different client locations would make both certification and proof of liability prohibitively unlikely.

Further, Defendant strongly denies any liability and the propriety of class certification for

---

[8]  See also Carrington v. Starbucks Corp., 30 Cal. App. 5th 504, 529 (2018) ("Although the trial court may have disagreed with Starbucks regarding the issue of liability, it clearly took the circumstances proffered by Starbucks into consideration when it imposed the penalty, as evident from the significant reduction of the $50 maximum penalty (per initial violation) to the penalty imposed—only $5 per initial violation[,] which] [t]he trial court stated [] was warranted because imposing the maximum penalty would be unjust, arbitrary, and oppressive based on Starbucks's 'good faith attempts' to comply with meal break obligations and because the court found the violations were minimal.").

any reason other than settlement.  (Mot. 25; Moon Decl., ¶ 15.)  Plaintiffs argue the continued litigation of this lawsuit presented Plaintiffs and Defendant with substantial legal risks that were (and continue to be) very difficult to assess.  The Court agrees that in light of the risks of delay and uncertainties of protracted litigation, as detailed below, the settlement amount reflects a fair and reasonable recovery for the Settlement Class Members.  (Moon Decl. ¶¶ 12-19; Melmed Decl. ¶¶ 11-14, 17, 19; Bokhour Decl. ¶ 8.)

For the approximately 3,780 members of the Class, the average gross recovery before deductions for taxes, fees, and other costs, is approximately $218.25 per class member.[9] Plaintiffs note the settlement amount is, of course, a compromise figure that by necessity took into account risks related to liability, damages, and all the defenses asserted by the Defendant. (Moon Decl. ¶ 16; Melmed Decl. ¶¶ 13, 17, 19; Bokhour Decl. ¶ 10.)  Plaintiffs additionally emphasize that each Settlement Class Member will be given the opportunity to opt out of the Settlement, allowing those who feel they have claims that are greater than the benefits they can receive under this Settlement, to pursue their own claims.  Plaintiffs therefore argue the value of this amount reflects a fair compromise well within the range of reasonableness, and given the strong case that Defendant could bring to bear to challenge certification and liability, this is not an inconsequential sum.

Plaintiffs also initially argued the fundamental fairness of the settlement is confirmed by the fact each Class Member would be compensated based on the number of weeks that they worked in a relevant position during the class period, as the Class members worked full time schedules, rendering allocation by work week equitable.  (Id.)  As noted above, the Agreement has now been modified after the Court expressed concerns at the hearing concerning this method of allocation.  See Fed. R. Civ. P. 23(e)(2)(D) (courts are to review whether "the proposal treats class members equitably relative to each other.").  The Agreement now provides for a pro-rata calculation based on hours worked rather than workweeks.  (Agreement ¶ 26(i); see also ECF No. 44-1 at 4.)  Plaintiffs proffer that under this revised method of calculation, and considering

---

[9]  This estimated amount is based on a simple calculation of the $825,000.00 Gross Settlement Amount divided equally among the 3,780 class members.

1  putative class members were employed on either a full-time or part-time basis, payments will be
2  distributed on a fair basis that accounts for employees' total hours, not workweeks, worked in the
3  relevant period.  (ECF No. 44-1 at 4.)

4        Plaintiffs proffer the Gross Settlement Amount of $825,000.00 is approximately 70% of
5  the $1,174,734.95 estimate of "*risk-adjusted* recovery (excluding interest) at *this* stage in the
6  litigation."  (Mot. 26 (emphasis in original).)  Plaintiffs contend such outcome is in line with a
7  carefully constructed estimate of the current fair value of the case, and that the maximum
8  damage values are estimates based on average wage rates, numbers of employees, and the
9  amount of time covered by the class period.  (Id.; Moon Decl., ¶ 17.)

10        Stepping back from the risk-adjusted recovery, Plaintiffs proffer the maximum calculated
11  reasonable exposure is $10,485,008.33, "after removing the *most* implausible or extreme
12  estimated recoveries . . . *including* PAGA penalties (which, nevertheless, includes a highly
13  optimistic view of what could be proven in this matter)."  (Mot. 27 (emphasis in original).)
14  Within this maximum calculated reasonable exposure, Plaintiffs submit the risk-adjusted value of
15  each claim, on a claim-by-claim basis, is as follows[10]:

16    • The estimated exposure for off the clock work over the class period was calculated to
17        be $1,809,662.25 (assuming 15 minutes of off-the-clock work each shift due to
18        standing in lines awaiting their turn to clock-in and Covid screenings).  With risk
19        factor discounts for certification (estimated at 0.3) and liability proof (estimated at
20        0.4), the current value of that claim is estimated by Plaintiffs' counsel to be only
21        $217,159.47.  (Mot. 27.)

22    • The estimated exposure for improper regular rate calculation of overtime, meal
23        premiums, sick pay (not considering additional remuneration) as well as failure to pay
24        split shift premiums over the class period was calculated to be $39,084.33.  With risk
25        factor discounts for certification (estimated at 0.5) and liability proof (estimated at
26        0.5), the current value of that claim is estimated by Plaintiff's counsel to be only

27  ─────────────────
28  [10]  The Court reproduces the proffered valuations essentially verbatim with slight alterations, such as removing emphasis.

$9,771.08.  (Mot. 27.)

- The reasonably estimated exposure for rest break violations over the class period was calculated at $3,935,525.75, but with low chances of certification and proof of liability (30% and 40% respectively) for a risk-adjusted exposure of $472,263.09 (based on an "extreme estimate" of two rest period violations for every Class Member in 100% of their work weeks).  (Mot. 27.)

- The reasonably estimated exposure for meal break violations over the class period was calculated at $54,876.00 considering paid by Defendant meal premiums before any risk reductions, but with low chances of certification and proof of liability (40% and 40% respectively) for a risk-adjusted exposure of $8,780.16 (based on an estimate of two meal period violations for every Class Member in 50% of their work weeks).  (Mot. 27.)

- The reasonably estimated exposure for unreimbursed expenses over the class period was calculated at $931,454.50 before any risk reductions, but with low chances of certification and proof of liability (30% and 30% respectively) for a risk-adjusted exposure of $83,830.91.  (Mot. 28.)

- Risk-adjusted penalty recoveries for wage statement and Labor Code § 203 penalties were estimated to be approximately with low chances of certification and proof of liability (30% and 30% respectively) $121,801.50 and $172,703.75, respectively, on maximum exposures of $1,353,350.00 and $1,918,930.50, respectively.  Plaintiffs proffer not only are the Section 203 and 226 penalties entirely dependent on the success of the off-the-clock claim, they both must also overcome the defense that Defendant did not intend any underpayment; additionally, the 226 penalty has a one-year statute.  (Mot. 28.)

- Performing risk-adjusted valuations for all claims yields a total value in the range of only $1,174,734.95, including PAGA.  PAGA penalties were calculated as having a maximum realistic exposure of $442,125.00, but a risk adjusted value of $88,425.00, after factoring in risks of reduction in penalties pursuant to Court discretion and the

1    high risk of the inability to prove violations for all aggrieved employees. (Mot. 28;

2    Moon Decl. ¶ 17.)

3        Plaintiffs also generally proffer that rest break and meal period claims have been

4    challenging to certify for many years; that off-the-clock claims have proven to be extremely

5    difficult to certify by their very nature; and "certification rates are lower than conventional

6    wisdom holds." (Mot. 28; Moon Decl. ¶ 18, citing H. Scott Leviant, *Second Interim Report on*

7    *class actions in California sheds new light on certification* (February 19, 2010), available at

8    http://www.thecomplexlitigator.com/post-data/2010/2/19/second-interim-report-on-class-

9    actions-in-california-sheds-n.html; *Findings of the Study of California Class Action Litigation*,

10   2000-2006, available at http://www.courtinfo.ca.gov/reference/documents/class-action-lit-

11   study.pdf.)   In estimating the risk adjustments here, Plaintiffs contend counsel has assumed

12   estimated certification probabilities of 30%-35%, depending on the claim, assumptions that equal

13   or substantially exceed the average rate at which cases were certified in California over the study

14   years, based upon data available through the California Courts website. Plaintiffs further submit

15   such certification risk estimates are likely high, given the factual challenges present in this case

16   in particular (for example, the myriad of work locations for class members and dispute resolution

17   agreements), and overall, the use of high estimates for certification overstates the realistic current

18   claim value. (Id.)

19       In sum, Plaintiffs submit that since the recovery is roughly 7.9% of the maximum

20   calculated reasonable exposure ($10,485,008.33, including PAGA), it meets the expected

21   outcome as outlined above. Plaintiffs further submit that it would also be appropriate to evaluate

22   the result by examining only the premium wages at issue, excluding penalties and interest,[11] and

23   ───────────────────────────────────────────

24   [11]   In this regard, Plaintiffs argue the exclusion of interest and penalties from the fairness evaluation is proper
     because, first, PAGA penalties are discretionary (Cal. Lab. Code § 2699(e)(2), and second, courts evaluate the
     strength of a proposed settlement without taking potential penalties or interest into consideration. See Rodriguez v.

25   W. Publ'g Corp., 563 F.3d 948, 955 (9th Cir. 2009) ("We conclude that the district court did not clearly abuse its
     discretion in finding that the $49 million settlement was fair, adequate, and reasonable even though it evaluated the
     monetary portion of the settlement based only on an estimate of single damages [as] [c]ourts are not precluded from

26   comparing the monetary component of a settlement to the estimated treble damages if, in their informed judgment,
     the strength of the particular case warrants it; but they are not obliged to do so in every antitrust class action [and]

27   [i]n this case, the settlement is substantial and meets the standard for approval by any measure."); Miller v. CEVA
     LOGISTICS U.S., INC., No. 2:13-CV-01321-TLN, 2015 WL 729638, at *7 (E.D. Cal. Feb. 19, 2015) ("Plaintiffs

28   concluded that Defendants' potential exposure for failure to pay wages for non-drive time work activity is

1   under that metric, the settlement would be approximately equal to 14.1% of the realistic

2   unreduced claim value for the premium wages at issue (wages, and meal and rest period

3   premiums).  (Mot. 29-30.)

4       The Court finds Plaintiffs' counsel's proffered value of 7.9%, and method of valuation,

5   sufficient for purposes of preliminary approval, taken in the context of the risks of continued

6   litigation and settlement as a whole.  "It is well-settled law that a cash settlement amounting to

7   only a fraction of the potential recovery will not per se render the settlement inadequate or

8   unfair," and "[i]t is the complete package taken as a whole, rather than the individual component

9   parts, that must be examined for overall fairness."  <u>Officers for Justice v. Civil Serv. Comm'n of</u>

10  <u>City & Cty. of San Francisco</u>, 688 F.2d 615, 628 (9th Cir. 1982); <u>In re Mego Fin. Corp. Sec.</u>

11  <u>Litig.</u>, 213 F.3d 454, 459 (9th Cir. 2000) (same).  The amount is not, on its face, outside the

12  bounds or range of reasonableness, and is higher than the valuation approved in other class

13  actions, or in line with many approved settlements.[12]  For purposes of preliminary approval, and

_____

14  approximately $750,000 (without interest and penalties) . . . Defendants' potential exposure for failure to pay the

15  premium wage for missed meal periods is approximately $1,425,000 (without interest and penalties) for two and a

16  half meal period violations per work week . . . Defendants' aggregate exposure for failure to pay wages and failure to provide meal periods, if Plaintiffs prevail on class certification, this will amount to $2,175,000 (without interest and penalties.).").  These limited authorities and Plaintiffs' arguments do not necessarily demonstrate to the Court one method is more proper than the other in this case, however, and the Court finds the settlement amount is sufficient at

17  the estimated value of 7.9%, the first proffered calculation method, and thus sufficient under either method.

18  [12]  See <u>Thomas v. Cognizant Tech. Sols. U.S. Corp.</u>, No. SACV111123JSTANX, 2013 WL 12371622, at *6 (C.D. Cal. June 24, 2013) (granting final approval in wage and hour action where settlement encompassed between 4.4%

19  and 5% of the maximum estimated liability figure); <u>In re Uber FCRA Litig.</u>, No. 14-CV-05200-EMC, 2017 WL 2806698, at *5 (N.D. Cal. June 29, 2017) (granting preliminary approval of settlement of Fair Credit Reporting Act

20  claims which encompassed as low as 0.75% to 7.5% of maximum valuation if willful violations were proved at trial); <u>In re AT & T Corp.</u>, 455 F.3d 160, 170 (3d Cir. 2006) (in securities fraud case, affirming class settlement

21  approval where settlement was only 4% of original valuation, which was devalued after summary judgment); <u>Rinky Dink Inc v. Elec. Merch. Sys. Inc.</u>, No. C13-1347 JCC, 2015 WL 11234156, at *4–5 (W.D. Wash. Dec. 11, 2015)

22  (granting preliminary approval of settlement of $1,250,000 where "potential exposure under the negligence standard can easily exceed $90,000,00," which is approximately 1.4% of the liability, based partially on proffered argument

23  that defendant could not pay a large settlement, with caveat that "in their Final Approval Brief, the parties must present concrete facts in support of the assertion that they were 'fully informed' and could thereby reasonably

24  conclude that it was doubtful whether Defendants would be able to pay a higher judgment."); <u>Stovall-Gusman v. W.W. Granger, Inc.</u>, No. 13-CV-02540-HSG, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (granting final

25  approval in wage and hour action where total settlement amount represented approximately 10% of potential value, and net settlement amount represented 7.3% of valuation); <u>Ma v. Covidien Holding, Inc.</u>, No. SACV 12-02161-DOC, 2014 WL 360196, at *5 (C.D. Cal. Jan. 31, 2014) (granting preliminary approval of wage and hour settlement

26  for 9.1% as within "range of reasonableness"); <u>In re MyFord Touch Consumer Litig.</u>, No. 13-CV-03072-EMC, 2019 WL 1411510, at *10 (N.D. Cal. Mar. 28, 2019) (granting preliminary approval of settlement of consumer warranty

27  claims for approximately 6% of valuation); <u>Thompson v. Costco Wholesale Corp.</u>, No. 14-CV-2778-CAB-WVG, 2017 WL 1957552, at *8 (S.D. Cal. May 11, 2017) (granting preliminary approval of settlement reflecting

28  approximately 10% of exposure, based on Court's experience with wage and hour class actions but stating at "the final approval hearing, the Court will give careful consideration to any objections from class members (or the lack

1   with the caveat that more extensive explanation and support for the discounting from the original

2   valuations may be needed for final approval, given the proffered strengths and weaknesses of the

3   claims and defenses, the costs and risks of pursuing this litigation through trial, and the benefit of

4   recovery now versus potentially no recovery, the Court finds the proposed recovery falls within

5   the range of possible approval and taken as a whole, weighs toward finding the Agreement fair,

6   reasonable, and adequate and in the best interests of the Class Members in light of all known

7   facts and circumstances.

8   / / /

9

10   thereof) when determining whether final approval is warranted."); Deaver v. Compass Bank, No. 13-CV-00222-JSC, 2015 WL 4999953, at *10 (N.D. Cal. Aug. 21, 2015) (granting preliminary approval of wage and hour

11   settlement representing 10.7% of liabilities and also noting concerns better addressed at final approval following claims administration process); In re Pool Prod. Distribution Mkt. Antitrust Litig., 310 F.R.D. 300, 316 (E.D. La.

12   2015) (granting preliminary approval of settlement of 2.5% of valuation in antitrust action, as "best-case scenario"); Schuler v. Medicines Co., No. CV 14-1149 (CCC), 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (granting final

13   approval in securities class action where settlement reflected approximately 4% of estimated recoverable damages); Balderas v. Massage Envy Franchising, LLC, No. 12-CV-06327 NC, 2014 WL 3610945, at *5 (N.D. Cal. July 21,

14   2014) (granting preliminary approval of settlement of claims regarding failure to reimburse business expenses where gross settlement represented approximately 8% of liability and net settlement represented 5%, as within range of

15   possible approval based on risks and expense of continued litigation, with caveat that "at the final approval hearing, the parties must be prepared to present evidence that the Court's calculation of the percentage of the maximum

16   recovery is incorrect, or to explain why the especially low recovery is warranted based on the circumstances of this case."); Martin v. Sysco Corp., No. 116CV00990DADSAB, 2019 WL 3253878, at *5 (E.D. Cal. July 19, 2019)

17   (while granting preliminary approval of settlement encompassing approximately 11% of total value of meal and rest break claims, adding caveat that "the court does not presently have material before it sufficient to make a reasoned

18   determination of whether the settlement amount proposed in the Agreement is adequate [but] [r]ather than denying preliminary approval of the Agreement in its entirety, however, the court finds that the most prudent course is to

19   raise the issue for the parties' awareness and invite them to provide additional argument and evidence in preparation for the final fairness hearing [as] [i]t may well be that in light of the serious litigation risks faced by plaintiff and the

20   class, settlement at such a dollar amount is warranted in this case."); Cooley v. Indian River Transp. Co., No. 1:18-CV-00491, 2019 WL 316634, at *8 (E.D. Cal. Jan. 24, 2019) (granting preliminary approval of wage and hour

21   settlement at approximately 11% of liability and despite concerns regarding attorney's fees award); Singh v. Roadrunner Intermodal Servs., LLC, No. 115CV01497DADBAM, 2018 WL 2412325, at *7 (E.D. Cal. May 29,

22   2018) (granting preliminary approval of wage and hour settlement for approximately 12% of liability), modified, No. 115CV01497DADBAM, 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018); Custom LED, LLC v. eBay, Inc, No.

23   12-CV-00350-JST, 2013 WL 6114379, at *3 (N.D. Cal. Nov. 20, 2013) (granting preliminary approval with range of recovery from 1.8% for one subclass, to 16% for another subclass of eBay sellers); Hendricks v. Starkist Co, No.

24   13-CV-00729-HSG, 2016 WL 5462423, at *5 (N.D. Cal. Sept. 29, 2016) (granting final approval in consumer class action and noting that while "[t]he $12,000,000 settlement amount, while constituting only a single-digit percentage

25   of the maximum potential exposure, is reasonable given the stage of the proceedings and the defenses asserted in this action."), aff'd sub nom. Hendricks v. Ference, 754 F. App'x 510 (9th Cir. 2018); Villegas v. J.P. Morgan Chase

26   & Co., No. CV 09-00261 SBA EMC, 2012 WL 5878390, at *6–7 (N.D. Cal. Nov. 21, 2012) (preliminarily approving settlement of approximately 15% of valuation despite concerns of such discount, noting the risks of

27   pursuing trial and that counsel acknowledged that some of Plaintiff's claims were not as viable as they had originally envisioned, fact that parties agreed to reduce proposed attorney's fees proportion from 33% to 25%, and further

28   stating that "[a]t any rate, issues concerning the amount of the settlement are better resolved at the final approval hearing," as after claims process is completed the parties and court are in better position to accurately calculate the value of settlement.).

3.     Amended Agreement Sufficiently Addresses Court's Previous Concerns By Removing FLSA Release

In evaluating the fairness of the proposed settlement amount, the Court has also reviewed the scope of the release of Defendant's liability.

Under the Agreement, every "Class Member, on behalf of himself or herself and his or her heirs and assigns, unless he or she has submitted a timely and valid Request for Exclusion (which will not effectuate an opt-out from the release of Released PAGA Claims), hereby releases Releasees [sic] from the following claims for the entire Class Period":

> any and all claims stated in the Action, or that could have been stated based on the facts alleged in the Action, implicitly or explicitly, including but not limited to state wage and hour claims (including all claims under the California Labor Code) for unpaid wages, minimum wage, overtime, off-the-clock work, meal periods, rest periods, wage statement violations, unreimbursed expenses, interest, penalties, and attorneys' fees, waiting time penalties, withholding from wages and the related provisions of the Labor Code including but limited to Labor Code §§ 201-204, 210, 216, 218.6, 226, 226.3, 226.7, 510, 512, 558, 1194, 1194.2, 1197, 1197.1, 1198, 1198.5, 1199, 2802, derivative claims under California Business & Professions Code §§ 17200 et seq., 2699, et seq and all claims under the governing Wage Orders ("Released Claims").

(Agreement ¶ 37(c).)

Prior to the hearing and submission of supplemental materials, the previous version of the agreement also provided that "as to any Class Member who cashes their Settlement Payment, the signing and negotiation of that check shall serve as the Class Member's consent to join the action for purposes of releasing claims arising under the Fair Labor Standards Act that are related to the claims stated in the Action, implicitly or explicitly." (ECF No. 28-1 at 48-49.)

The FLSA provides the right of an employee to represent similarly situated employees in a suit against their employer for the failure to pay minimum wage or overtime compensation. See 29 U.S.C. § 216(b). Unlike a class action under Rule 23, to participate in the collective action, an employee is required to give his consent in writing to become a party. 29 U.S.C. § 216(b); see Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989) (rights in a collective action under the FLSA are dependent on the employee receiving accurate and timely notice

1   about the pendency of the collective action, so that the employee can make informed decisions

2   about whether to participate).   "If an employee does not file a written consent, then that

3   employee is not bound by the outcome of the collective action."   Edwards v. City of Long Beach,

4   467 F.Supp.2d 986, 989 (C.D. Cal. 2006).

5        At the hearing, the Court voiced its concerns that the while this release appeared in the

6   settlement agreement, FLSA was not mentioned anywhere in the Agreement, and is not part of

7   the operative complaint in either action.   Even further than that issue, the Court inquired whether

8   this is a proper release in light of the FLSA opt-in requirement.   See, e.g., 29 U.S.C. § 216(b)

9   ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing

10  to become such a party and such consent is filed in the court in which such action is brought.");

11  Beltran v. Olam Spices & Vegetables, Inc., No. 118CV01676NONESAB, 2020 WL 7769822, at

12  *8–9 (E.D. Cal. Dec. 30, 2020) ("The undersigned has previously preliminarily approved a

13  similar FLSA opt-in procedure in which FLSA collective members cash their checks . . .

14  However, in none of these cases has the issue of whether such a process comports with the FLSA

15  been seriously discussed.   A recent decision from one judge of this court calls into question the

16  "opt-in by settlement check" approach."); Smothers v. NorthStar Alarm Servs., LLC, No.

17  217CV00548KJMKJN, 2019 WL 280294, at *10–12 (E.D. Cal. Jan. 22, 2019) ("Courts more

18  elevated than this one have read the statutory language as requiring written consent filed with the

19  court, albeit not in formal holdings . . . [t]his court thus joins those that have consulted § 216(b)'s

20  requirements and rejected similar opt-in by settlement check proposals."); Peterson v. CJ Am.,

21  Inc, No. 14CV2570 DMS (JLB), 2015 WL 11582833, at *7 (S.D. Cal. Dec. 16, 2015).

22       The FLSA release provision no longer appears in the Agreement and thus the Court's

23  concerns regarding the provision are no longer relevant to the analysis.

24       The PAGA release provides:

25            For purposes of this Settlement, "Released PAGA Claims" means
              all claims that have been pled or could have been pled, based upon
26            the factual allegations and issues set forth in the Notice to the
              LWDA and alleged in the Complaint, including civil penalties
27            under PAGA, fees, and all other claims and allegations made or
              which could have been made in the Action based on the facts and
28            allegations pled in Plaintiff MARIA BUSTOS RAMIREZ's Notice

1
2
to the LWDA and the Complaint. Plaintiff MARIA BUSTOS
RAMIREZ's Notice to the LWDA is attached hereto as **Exhibit "B**."

3   (Agreement ¶ 16.)   The Court finds the class and PAGA releases permissible because it only

4   encompasses claims that are based on the same facts underlying the claims asserted in the

5   operative complaint, and does not release factually unrelated claims.   See Hesse v. Sprint Corp.,

6   598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing

7   a related claim in the future even though the claim was not presented and might not have been

8   presentable in the class action, but only where the released claim is based on the identical factual

9   predicate as that underlying the claims in the settled class action.") (internal quotations and

10   citations omitted); Collins, 274 F.R.D. at 303 ("These released claims appropriately track the

11   breadth of Plaintiffs' allegations in the action and the settlement does not release unrelated

12   claims that class members may have against defendants.").

13   　　　　4.   PAGA Penalty Claims

14   　　　　The Court briefly and separately addresses the PAGA penalty claims.   As noted above,

15   allocation of the penalties under PAGA are in the amount of $85,000.00, of which seventy-five

16   percent (75%) or $63,750.00, will be paid to the LWDA, and the remaining twenty five percent

17   (25%) or $21,250.00, will be included in the Net Settlement Amount for PAGA Employees.

18   (Agreement ¶ 11.)

19   　　　　In the class action context, where PAGA claims are also often brought, a district court

20   must independently determine that a proposed settlement agreement is "fundamentally fair,

21   adequate and reasonable" before granting approval.   See Officers for Justice, 688 F.2d at 625;

22   see also In re Heritage Bond Litigation, 546 F.3d 667, 674–75 (9th Cir. 2008).   The LWDA has

23   provided some guidance regarding court approval of PAGA settlements.   See Gutilla v. Aerotek,

24   Inc., No. 115CV00191DADBAM, 2017 WL 2729864, at *2 (E.D. Cal. Mar. 22, 2017)

25   (discussing California Labor and Workforce Development Agency's Comments on Proposed

26   PAGA Settlement ("LWDA Comments") (citing O'Connor v. Uber Techs., Inc., 201 F. Supp. 3d

27   1110, 1133 (N.D. Cal. 2016)).

28   　　　　In O'Connor, where both class action and PAGA claims were covered by a proposed

1 settlement, the LWDA stated that:

> It is [] important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, [it is important that] the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

Id.

The proposed $85,000.00 penalty payment in this case represents approximately 10.3% of the $825,000.00 gross settlement amount.  This amount exceeds previously approved comparable PAGA penalties in other class actions, in this court and others.  See Wise v. Ulta Salon, Cosmetics & Fragrance, Inc., No. 117CV00853DADEPG, 2020 WL 1492672, at *5 (E.D. Cal. Mar. 27, 2020) (approving $75,000 PAGA penalty, or approximately 2% of $3.4 million gross settlement); Garcia v. Gordon Trucking, Inc., No. 1:10-cv-0324-AWI-SKO, 2012 WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving $10,000 PAGA penalty, or approximately 0.27% of 3.7 million gross settlement); Chu v. Wells Fargo Investments, LLC, No. C-05-4526-MHP, 2011 WL 672645, at *1 (N.D. Cal. Feb. 16, 2011) (approving $10,000 PAGA penalty, or approximately 0.14% of $6.9 million gross settlement).

Having reviewed the parties' submission and the terms of the proposed settlement, the Court finds that the settlement amount related to Plaintiffs' PAGA claims is fair, reasonable, and adequate in light of the public policy goals of PAGA.  Because of the risks associated with the pursuit of further litigation in this action articulated above, the Court finds that the amount offered in settlement of the PAGA claims here weighs in favor of final approval of the settlement.

5.     The Effectiveness of the Proposed Method of Distributing Relief

The Court is to consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."  Fed. R. Civ. P. 23(e)(2)(C)(ii).

For the reasons discussed herein, the Court finds in favor of granting approval of the non-reversionary agreement, finds the proposed method of distributing relief is effective, and weighs

toward a determination that the Agreement is fair, reasonable and adequate.  The Court discusses specific aspects of the Agreement that relate to this factor in greater detail below, including the *cy pres* distribution, the equitable distribution of class funds, and the notice and claims processing provisions.

### 6.   *Cy Pres* Distribution

The parties had previously chosen the Children's Advocacy Center, an organization committed to assisting children who are victims of physical or sexual abuse, or who have witnessed acts of violence.  As the Court stated at the hearing, it did not appear the chosen charity was sufficiently connected to the class as to comply with Ninth Circuit law.

"In the context of class action settlements, a court may employ the *cy pres* doctrine to 'put the unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class.' "  Nachshin v. AOL, LLC, 663 F.3d 1034, 1038 (9th Cir. 2011) (quoting Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007)).  As the Ninth Circuit observed, "a growing number of scholars and courts have observed, the *cy pres* doctrine—unbridled by a driving nexus between the plaintiff class and the *cy pres* beneficiaries—poses many nascent dangers to the fairness of the distribution process," and "[s]ome courts appear to have abandoned the 'next best use' principle implicit in the *cy pres* doctrine . . . [awarding'] *cy pres* distributions to myriad charities which, though no doubt pursuing virtuous goals, have little or nothing to do with the purposes of the underlying lawsuit or the class of plaintiffs involved."  Nachshin, 663 F.3d at 1038-39.

"When selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel, or the court."  Id. at 1039.  "To remedy some of these concerns, we held in *Six Mexican Workers* that *cy pres* distribution must be guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members."  Id. at 1039-40 ("The *cy pres* distribution also fails to target the plaintiff class, because it does not account for the broad geographic distribution of the class.").  Therefore, "[i]f the settlement contemplates a cy pres award, the parties shall identify the proposed cy pres recipient, and

1   explain how the recipient's mission or goals are related to the interests of the class members,"

2   and "[t]he parties shall also identify any relationship they or their counsel have with the proposed

3   cy pres recipient."  City of Long Beach v. Monsanto Co., No. CV 16-3493 FMO (ASX), 2020

4   WL 10540857, at *2 (C.D. Cal. July 13, 2020).

5          In the supplemental briefing, the parties state they have amended the Agreement so that

6   the *cy pres* recipient is now Legal Aid at Work—a nonprofit organization committed to

7   advocating for employees' rights and providing legal services to low-income communities,

8   located at 180 Montgomery St., Suite 600, San Francisco, CA 94104.  (ECF No. 44-1 at 4.)

9   Upon receiving the amended settlement agreement, as noted above, the Court ordered additional

10  declarations concerning any connection between the parties and the proposed *cy pres* recipient,

11  and has received such declarations from all counsel and all parties, attesting that the parties and

12  counsel have no connection or interest in the proposed *cy pres* recipient.  (See ECF Nos. 46-53.)

13         The Court finds the *cy pres* recipient is sufficiently connected to the objectives of the

14  underlying statutes, the interests of the silent class members, and finds no conflict of interest

15  with the recipient and the parties or counsel.  Nachshin, 663 F.3d at 1038-40; Monsanto, 2020

16  WL 10540857, at *2.  The Court finds this component of the Agreement weighs in favor of

17  granting preliminary approval.

18         7.     Attorneys' Fees and Other Signs of Collusion

19         The Ninth Circuit has emphasized that courts "must be particularly vigilant not only for

20  explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their

21  own self-interests and that of certain class members to infect the negotiations."  In re Bluetooth

22  Headset Prod. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011).  The Ninth Circuit has identified

23  that the following aspects may be such signs of collusion: (1) "when counsel receive a

24  disproportionate distribution of the settlement, or when the class receives no monetary

25  distribution but class counsel are amply rewarded"; (2) "when the parties negotiate a 'clear

26  sailing' arrangement providing for the payment of attorneys' fees separate and apart from class

27  funds"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than

28  be added to the class fund."  Id. (internal citations and quotation marks omitted).

In assessing the whether the relief provided the class is adequate, the Court is to consider "the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). Here, the Agreement provides that "[s]ubject to approval by the Court, Defendant will not object to Class Counsel's application for attorney's fees not to exceed 33 1/3% of the Gross Settlement Amount ($275,000.00) and reimbursement of litigation costs and expenses not to exceed $30,000.00." (Agreement 26(m).)

Federal Rule 23(h) provides that "[i]n a certified class action, the court may award attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." The Ninth Circuit has affirmed the use of two separate methods of calculating attorney's fees, depending upon the case. Hanlon, 150 F.3d at 1029. "In 'common-fund' cases where the settlement or award creates a large fund for distribution to the class, the district court has discretion to use either a percentage or 'lodestar method.' " Id. In the Ninth Circuit, courts typically utilize twenty-five percent of the common fund as the "benchmark" for a reasonable fee award, with adjustments provided there is adequate explanation in the record for any special circumstances that justify departure. In re Bluetooth, 654 F.3d at 942. The usual range for common fund attorney fees are between twenty to thirty percent. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002).

The "lodestar" method is typically used where the benefit received by the class is primarily injunctive in nature, and therefore, monetary benefit is not easily calculated. In re Bluetooth, 654 F.3d at 941. The "lodestar" approach calculates attorney fees by multiplying the number of hours reasonably expended by a reasonable hourly rate. Gonzalez v. City of Maywood, 729 F.3d 1196, 1202 (9th Cir. 2013); Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008). Since the benefit to the class is easily calculated in a common find case, courts may award a percentage of the common fund rather than engaging in a "lodestar" analysis to determine the reasonableness of the fee request. In re Bluetooth, 654 F.3d at 942. When applying the percentage of the common fund method in calculating attorney fees, courts use the "lodestar" method as a crosscheck to determine the reasonableness of the fee request. See Vizcaino, 290 F.3d at 1050. "This amount may be increased or decreased by a multiplier that

1 | reflects any factors not subsumed within the calculation, such as 'the quality of representation,

2 | the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk

3 | of nonpayment.' " Adoma v. Univ. of Phoenix, Inc., 913 F. Supp. 2d 964, 981 (E.D. Cal. 2012)

4 | (quoting In re Bluetooth, 654 F.3d at 942).

5 |      In the motion's fee request, Plaintiffs note that the benchmark in the Ninth Circuit is

6 | 25%, however, present no specific arguments as to why the fees should exceed the benchmark

7 | and be awarded at the level of 33⅓%, other than stating "[t]he percentage can be adjusted

8 | upwards where the risks overcome, the benefits obtained and the work necessary to achieve

9 | those results supports such an adjustment of the benchmark [and] [t]he results here fully support

10 | the requested fee." (Mot. 30.)   Plaintiffs' motion then proceeds to state that "Plaintiffs will

11 | provide the Court with information for the purposes of calculating attorney's fees under the

12 | lodestar method should the Court so desire for ruling on Plaintiffs' fee application at the final

13 | fairness hearing," and that the fee request "represents the fair market value of their labor, and it

14 | is fair that every class member who benefits from the opportunity to claim a share of the

15 | settlement pay his or her pro rata share of attorney's fees."  (Mot. 30.)  In this regard, Plaintiffs

16 | state "[t]he regular contingent fee contract of Plaintiffs' counsel provides for attorney's fees

17 | between 35% and 40% of any recovery obtained for the client [and] [i]t would be unfair to

18 | compensate Plaintiffs' counsel at any lesser rate than the amount requested because the value of

19 | their labor is consistent with the requested fee."

20 |      The requested attorneys' fee in the amount of 33⅓% is not *per se* excessive, and

21 | importantly, the Court forewarns Plaintiffs that it is not likely to approve an amount over the

22 | Ninth Circuit's benchmark of twenty-five percent (25%) absent a showing that counsel achieved

23 | extraordinary results or otherwise prove they are entitled to such an amount.

24 |      While the Agreement contains a clear sailing agreement given the Defendant has agreed

25 | not to oppose such fee request, given the Court's caution and potential to reduce the fee award

26 | inclination, the Court finds it significant that the Agreement explicitly provides that should the

27 | Court approve a fee award of less than 33⅓%, "the difference between the lesser amount(s)

28 | approved by the Court and the attorney's fees and costs set forth above shall be added to the Net

1  Settlement Amount." (Agreement ¶ 26(m).)

2      Further, there is no reversion to the Defendant. Remaining funds will be distributed to a

3  *cy pres* recipient, as discussed above.

4      Therefore, despite the amount being above the benchmark and the clear sailing

5  agreement, given the award can be determined at final approval when appropriate arguments and

6  supporting documents are presented, and any reduction in the award will revert back to the funds

7  available for the Class Members, the Court finds this aspect of the agreement is fair, reasonable,

8  and adequate for purposes of preliminary approval. See Millan, 310 F.R.D. at 613 (despite

9  concerns regarding the anticipated request for attorney's fees based on one-third of the net

10 settlement fund despite the twenty-five percent (25%) benchmark, stating "the Court need not

11 resolve this matter at the preliminary approval stage, since the propriety of the fee request is an

12 issue that can be determined at the Final Fairness Hearing," and that "Plaintiffs' counsel should

13 be mindful of this issue and should be prepared to present a lodestar calculation in connection

14 with their motion for attorneys' fees and for final approval.").

15     At the final approval hearing, the Court will employ the lodestar method as a cross check

16 on the percentage method to ensure a failure and reasonable result. Alberto v. GMRI, Inc., 252

17 F.R.D. 652, 668 (E.D. Cal. 2008). Plaintiffs' counsel should be prepared to support their request

18 above the 25% benchmark under the percentage of the fund method, and be prepared to support

19 their request with a sufficient presentation of the lodestar calculation. In submitting the final

20 approval of class action settlement counsel will be required to provide a thorough fee award

21 petition that details the hours reasonably spent representing Plaintiffs with sufficient specificity

22 for the Court to evaluate the hours expended in this action. The parties are further advised that to

23 support an expense award, Plaintiffs should file an itemized list of expenses by category and the

24 total amount advanced for each category, allowing the Court to assess whether the expenses are

25 reasonable. Flores v. TFI Int'l Inc., No. 12-CV-05790-JST, 2019 WL 1715180, at *11 (N.D.

26 Cal. Apr. 17, 2019). At final approval counsel will also be required to provide receipts to

27 support their claimed expenses. Flores, 2019 WL 1715180, at *11.

28 ///

1    **8.    Any Agreement Required to be Identified under Rule 23(e)(3)**

2    The Court is to consider any agreement required to be identified under Rule 23(e)(3).

3    Fed. R. Civ. P. 23(e)(2)(C)(iv).  "The parties seeking approval must file a statement identifying

4    any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3).  The parties

5    have identified no such agreement and the Court is not aware of any such agreement.

6    **9.    The Proposal Treats Class Members Equitably Relative To Each Other**

7    The Court is also to consider whether "the proposal treats class members equitably

8    relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  The Motion does not specifically address

9    this factor under 23(e)(2)(D), however the motion does discuss the incentive awards.

10   As noted above, Plaintiffs previously argued the initial settlement agreement was fair

11   because class members would be compensated based on the number of weeks that they worked

12   in a relevant position during the class period, as the Class members worked full time schedules,

13   rendering allocation by work week equitable.  (Id.)  As summarized above, the Agreement has

14   now been modified after the Court expressed concerns at the hearing concerning this method of

15   allocation, and now provides for a pro-rata calculation based on hours worked rather than

16   workweeks.  (Agreement ¶ 26(i); see also ECF No. 44-1 at 4.)  Plaintiffs proffer that under this

17   revised method of calculation, and considering putative class members were employed on either

18   a full-time or part-time basis, payments will be distributed on a fair basis that accounts for

19   employees' total hours, not workweeks, worked in the relevant period.  (ECF No. 44-1 at 4.)

20   The Court finds the Agreement's modification sufficiently addressed the Court's concerns

21   regarding equitable treatment, and finds the Agreement treats class members equitably relative to

22   each other.  The Court finds this is a presumptively reasonable manner of equitably treating the

23   Class Members for purposes of preliminary approval.

24   As part of this factor, the Court also determines whether the settlement "improperly

25   grant[s] preferential treatment to class representatives or segments of the class."  In re

26   Tableware Antitrust Litig., 484 F. Supp. 2d at 1079.  In assessing the appropriateness of class

27   representative enhancements or incentive payments, the Court may consider factors such as the

28   actions the plaintiffs took to protect the interests of the class, the degree to which the class has

1    benefitted, the amount of time and effort the plaintiff expended in pursuing litigation, and any

2    notoriety or personal difficulties encountered by the representative plaintiff.  Khanna v. Intercon

3    Sec. Systems, Inc., No. 2:09-cv-2214 KJM EFB, 2014 WL 1379861, at *10 (E.D. Cal. Apr. 8,

4    2014); Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 257 (E.D. Penn. 2011); see also

5    Staton, 327 F.3d at 975-77 (9th Cir. 2003).  "Incentive awards are particularly appropriate in

6    wage-and-hour actions where plaintiffs undertake a significant 'reputational risk' by bringing

7    suit against their former employers."  Bellinghausen v. Tractor Supply Co., 306 F.R.D. 245, 267

8    (N.D. Cal. 2015) (citation omitted).

9          Turning to the class representative awards (or service awards), Plaintiffs argue the awards

10   in the amount of $7,500 to each Plaintiff, Ramirez and Holguin, are reasonable given the risks

11   undertaken by Plaintiffs in filing litigation against an employer; and additionally because

12   Plaintiffs were actively involved in the litigation and settlement negotiations of this Action,

13   worked diligently with counsel to prepare the action, and conferred with counsel regarding

14   settlement negotiations.  (Mot. 32; Ramirez Decl. ¶¶ 5- 19; Holguin Decl. ¶¶ 9; Moon Decl. ¶ 32;

15   Melmed Decl. ¶ 12.)  Plaintiffs also suggest the amount is reasonable as Plaintiffs will also

16   provide a general release as a condition of the enhancement.  (Mot. 32.)

17         Incentive awards are "intended to compensate class representatives for work done on

18   behalf of the class, to make up for financial or reputational risk undertaken in bringing the action,

19   and, sometimes, to recognize their willingness to act as a private attorney general."  Rodriguez v.

20   W. Publ'g Corp., 563 F.3d 948, 958–59 (9th Cir. 2009).  They are considered "fairly typical in

21   class actions cases," Id. at 958 (emphasis omitted), and "are particularly appropriate in wage-

22   and-hour actions where plaintiffs undertake a significant 'reputational risk' by bringing suit

23   against their former employers."  Bellinghausen v. Tractor Supply Co., 306 F.R.D. 245, 267

24   (N.D. Cal. 2015) (citation omitted); see also In re Online DVD-Rental Antitrust Litig., 779 F.3d

25   934, 943 (9th Cir. 2015) (holding that the incentive payments to the class representative by

26   themselves do not create an impermissible conflict between the class members and the class

27   representatives).

28         In  assessing  the  appropriateness  of  class  representative  enhancements  or  incentive

1    payments, the Court must consider factors such as: (1) the actions the plaintiff took to protect

2    the interests of the class; (2) the degree to which the class has benefitted from those actions; (3)

3    the duration of the litigation and the amount of time and effort the plaintiff expended in

4    pursuing litigation; and (4) any notoriety or personal difficulties encountered by the

5    representative plaintiff.  Khanna v. Intercon Sec. Systems, Inc., No. 2:09-CV-2214 KJM EFB,

6    2014 WL 1379861, at *10 (E.D. Cal. Apr. 8, 2014); Reibstein v. Rite Aid Corp., 761 F. Supp.

7    2d 241, 257 (E.D. Penn. 2011); see also Staton v. Boeing Co., 327 F.3d 938, 975–77 (9th Cir.

8    2003).

9         In the Ninth Circuit, courts have found that $5,000 is a presumptively reasonable service

10   award.  See Harris v. Vector Marketing Corp., No. C-08-5198 MEC, 2012 WL 381202, at *7

11   (N.D. Cal. Feb. 6, 2012) (collecting cases).  Where the representative seeks an award over the

12   "presumptively reasonable" amount, many courts in this Circuit also consider the proportionality

13   between the incentive payment and the range of class members' settlement awards and the

14   settlement amount to determine whether the requested incentive payment is excessive.  See id.

15   (collecting cases); Dyer v. Wells Fargo Bank, N.A., 303 F.R.D. 326, 335 (N.D. Cal. 2014);

16   Hopson v. Hanesbrands Inc., No. CV-08-0844 EDL, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3,

17   2009).  Importantly, such payments must be "scrutinize[d] carefully ... so that they do not

18   undermine the adequacy of the class representatives."  Radcliffe v. Experian Info. Sols. Inc., 715

19   F.3d 1157, 1168 (9th Cir. 2013) (citing Staton, 327 F.3d at 977).  Given that service awards are

20   at the discretion of the district court, In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 463 (9th

21   Cir. 2000), whatever the method used, the Court must make sure that where there is a "very large

22   differential in the amount of damage awards between the named and unnamed class members,"

23   that differential is justified by the record.  Staton, 327 F.3d at 978.

24        Here, the service award amount constitutes a large differential with respect to the

25   amounts to be awarded to named versus unnamed class members, as each service award

26   constitutes more than thirty-four (34) times the proffered average individual gross settlement

27   amount of $218.25 per class member.  Nevertheless, based on the foregoing and for purposes of

28   this preliminary approval of the settlement, the Court finds the settlement terms are "within the

range of possible approval," Murillo v. Pac. Gas & Elec. Co., 266 F.R.D. 468, 479 (E.D. Cal. 2010).  However,  based upon the present record, the Plaintiff is forewarned that it is not inclined to provide such an incentive award.  Accordingly, this factor demonstrates the settlement agreement is fair, reasonable, and adequate, and weighs in favor of preliminary approval of the settlement.  However, the Court forewarns the parties it may reduce the awards if not substantially justified by declarations demonstrating the hours expended at final approval.

Accordingly, the Court finds this factor demonstrates the Agreement is fair, reasonable and adequate, and weighs in favor of preliminary approval of the settlement.

10.    The Proposed Class Notice and Settlement Administration

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); see also Hanlon, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."). For a "class certified under Rule 23(b)(3)— or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The notice may be by one or more of the following methods: United States mail, electronic means, or other appropriate means. Id. The "notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Id. A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004) (internal quotations and citations omitted).

As for the content of the notice, Plaintiffs argue it complies with the requirements of Rule 23(c)(2)(B), in that it: describes the: nature of the action; the definition of the class certified; the

class claims, issues, or defenses; that class members may enter an appearance through counsel; that the Court will exclude any class member who requests exclusion, stating when and how members may elect to be excluded; and describes the binding effect of a class judgment on class members under Rule 23(c)(3).  (See Moon Decl., Ex. A.)  The Court has reviewed the content of the notice and finds it complies with the statue's requirements.  Fed. R. Civ. P. 23(c)(2)(B); Churchill Vill., 361 F.3d at 575.

Plaintiffs contend the parties have agreed to provide notice through first class mail to class members, whose last known addresses are known to Defendant; and that if any notices are returned with new forwarding addresses, the administrator will re-mail the Notice to the current address.  (Mot. 32.)  Plaintiff summarily states: "[t]his method of notice clearly suffices."  (Mot. 32.)  The Court is not immediately convinced this method clearly suffices here, as Plaintiffs provide no other argument or facts demonstrating why here for these Class Members, how this is the best notice practicable under the circumstances.  The Court turns to additional information in the Agreement.

The notice will issue in both English and Spanish.  (Agreement ¶¶ 26(t), 27, 32.)  The Notice will be distributed within 28 calendar days of the Preliminary Approval Date (Mot. 12; Agreement ¶ 32(b).)  Specifically, "[w]ithin 14 calendar days from the date of preliminary approval of this Settlement by the Court, Defendant shall provide to the Settlement Administrator a class database containing the following information for each Class Member a list in Microsoft Excel format (or other format acceptable to the Settlement Administrator) containing each Settlement Class Member's (1) full name, (2) last known address, (3) Social Security Number, and (4) the total number of Covered Workweeks for each Class Member in California during the Class Period as a non- exempt employee ("Class List")."  (Agreement ¶ 32(a).)  The Settlement Administrator will run a check of the Class Members' addresses against those on file with the U.S. Postal Service's National Change of Address List."  (Agreement ¶ 32(a).)

Within fourteen (14) calendar days of receipt of the Class List, the Settlement Administrator will mail the notice to the Class Members by First Class United States mail,

setting forth the material terms of the proposed Settlement, along with instructions about how to object or request exclusion from the proposed class action Settlement ("Class Notice"). (Agreement ¶¶ 26(s), 32(b).)  The Administrator will skip-trace returned mail and re-mail the notice to the new addresses within five calendar days.  (Id.)

Class Notices returned to the Settlement Administrator as non-deliverable on or before the initial Response Deadline shall be resent to the forwarding address, if any, on the returned envelope.  (Agreement ¶ 32(c).)  A returned Class Notice will be forwarded by the Settlement Administrator any time that a forwarding address is provided with the returned mail. (Id.)  If there is no forwarding address, the Settlement Administrator will do a computer search for a new address using the Class Member's social security number and/or other information.  (Id.)  In any instance where a Class Notice is remailed, that Class Member will have until the extended Response Deadline as described above.  (Id.)  A letter prepared by the Settlement Administrator will be included in the re-mailed Class Notice in that instance, stating the extended Response Deadline if different than the original Response Deadline.  (Id.)  Class Counsel shall provide to the Court a declaration by the Settlement Administrator of due diligence and confirming mailing of the Notices.  (Agreement ¶ 32(d).)

For each Class Member, there will be preprinted information on the mailed Class Notice, based on Defendant's records, stating the Class Member's hours worked in all Covered Workweeks during the Class Period and the estimated total Settlement Payment under the Settlement, including the Settlement Class Payment and the PAGA Settlement Payment that will be distributed irrespective of any exclusion request.  (Agreement ¶¶ 26(s).)  A Class Member may dispute the pre-printed information on the Notice as to his or her Covered Workweeks during the Class Period.  (Id.)

"Response Deadline" means "the date sixty (60) days after the Settlement Administrator initially mails the Notice to Settlement Class Members and the last date on which Settlement Class Members may submit a request for exclusion or written objection to the Settlement. (Agreement ¶ 7.)  In the case of a re-mailed Notice, the Response Deadline will be the later of 60 calendar days after initial mailing or 14 calendar days from re-mailing."  (Id.)  Class Members

1   must submit any dispute regarding the information on the Class Notice to the Settlement

2   Administrator as to his or her Covered Workweeks within the Response Deadline. (Id.) Written

3   objections must be submitted by the response deadline; oral objections may be presented at the

4   time of hearing. (Mot. 12; Agreement ¶ 26(x).) The procedure for exclusion requests, mailing a

5   request to the Administrator, is the same as the procedure for submitting a written objection.

6   (Agreement ¶¶ 26(w) and 26(x).) "No specific wording is required to state a Request for

7   Exclusion, so long as it is clear and unequivocal," however, "[a]ny Request for Exclusion must

8   include the name, address, telephone number, last four digits of the Class Member's Social

9   Security Number, and the signature of the Class Member requesting exclusion to protect against

10  falsified Requests for Exclusion [and] [a]ny such request must be made in accordance with the

11  terms of the Class Notice, and the Class Notice will advise Class Members of these

12  requirements." (Agreement ¶ 26(w).)

13       "The Settlement Administrator will post the final judgment approving the Settlement on a

14  website maintained by the Settlement Administrator for a period of not less than 90 calendar

15  days after the final judgment is entered . . .[and] [t]he address of that website will be included in

16  the Class Notice." (Agreement ¶ 30.)

17       The Court finds the notice and the method of delivery is appropriate and appears to be the

18  "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). However, the

19  Court highlights that in a recent case, the Ninth Circuit held a single mailed notice, along with the

20  placement of information posters in the buildings where employees worked, was not the best

21  practicable under the circumstances, finding "it particularly problematic that, despite concerns that

22  former employees in particular might be difficult to reach by mail, the settlement provided no

23  other means of reaching former employees," and "when at least 12% of the mailed notices were

24  ultimately determined to be undeliverable—meaning those class members had not received

25  notice—still no additional means of notice reasonably calculated to reach those class members

26  was attempted." Roes, 944 F.3d at 1046. The class members were former and current

27  employees in adult entertainment clubs, and "[a]lthough the mailed notice was supplemented

28  with posters that were hung in the defendant night clubs, those posters were likely to be seen

1    only by class members who were still working at the nightclubs, and those class members are

2    also the precise group of people for whom the defendants likely had a current address such that

3    mail notice could successfully be effected." Id.  Further, "[a]s to those former employees for

4    whom the claims administrator *was* able to identify a valid address, the lack of reminder notices

5    is particularly relevant, given that the posters would serve no function." Id. at 1047.  The Ninth

6    Circuit held that "[i]n sum, the notice process was not 'reasonably calculated, under all the

7    circumstances,' to apprise all class members of the proposed settlement, because the

8    'circumstances' included the district court's and parties' belief that class members were

9    'transient' and thus might be difficult to reach by mail, and the posters also were not reasonably

10   calculated to reach all of the absent class members who could not be notified by mail or to serve

11   as a reminder to those who did receive the single mailed notice." Id.

12        While only providing notice by U.S. mail, there are additional factors that show this

13   method is not insufficient as found in Roes.  See Roes, 944 F.3d at 1046-47.  First, there is no

14   indication that the former employees will be significantly difficult to locate addresses for, where

15   in Roes the former employees were described as transient.  Id.  Second, prior to initially mailing

16   the Notice Packets, the Settlement Administrator will run a check of the Class Members'

17   addresses against those on file with the U.S. Postal Service's National Change of Address List."

18   (Agreement ¶ 32(a).)  Then, if a Notice Packet is returned as undeliverable, the Settlement

19   Administrator will promptly re-mail it to a forwarding address, if provided, or to an updated

20   address obtained from a skip-trace search, and the deadlines will be extended accordingly.

21        The Court also finds it significant that there is no opt-in procedure here, as Class

22   Members do not have to confirm workweeks or take other action to have a check mailed to them,

23   and there is no reversion to Defendant here.[13]

---

[13]  In Roes, the Ninth Circuit also found the notice was not the best notice practicable under the circumstances
because, "[f]or example, even if, as defendants suggest, e-mail notice was infeasible, information about the
settlement could have been electronically disseminated through social media or postings on any relevant online
message boards.  To illustrate this possibility, the Union points out that, in another settlement involving sister
entities of some of the defendants in this case, the parties disseminated notice not only via U.S. Mail and email, but
also through ads targeting class members on social media, and by posting on StripperWeb.com, a website that has
117,000 members and has forums dedicated to the exotic dancer community.  Particularly here, where the parties
knew the names and other identifying information of the class members—even if not all of their current addresses—
these types of supplemental notice methods appear practicable." Roes, 944 F.3d at 1047.  The Court does not feel

Accordingly, based on all of the above aspects of the Agreement, the Court finds the notice and the method of delivery by U.S. mail, with an initial check for updated addresses with a national database, re-mailing of Notice Packets following return as undeliverable after a further database check for updated addresses, is appropriate, appears to be the "best notice that is practicable under the circumstances," and therefore meets the requirements of Federal Civil Procedure Rule 23(c)(2)(B).

### 11.    Settlement Administration Costs

The notice portion of the Settlement will be administered by a third-party Administrator, ILYM Group, Inc., and actual costs of administration are estimated to be $30,000.00.  (Mot. 12; Agreement ¶ 26(p).)   At the hearing, the Court notified the parties that the settlement administrator's declaration attached to the initial motion cited to the incorrect case name in affirming no financial interest to the parties or counsel.  (See ECF No. 28-4 at 2.)   The supplemental briefing has provided a corrected declaration.  (See ECF No. 44-6 at 3.)

The Court has reviewed the estimate which is broken down by individual estimates of tasks and hours, and finds the estimate to be reasonable for the administration of this settlement.

## VI.

## CONCLUSION AND ORDER

Notwithstanding attention to the concerns stated herein that may need to be further addressed at the final approval hearing, including but not limited to the proposed attorney's fees award and Plaintiffs' proposed service awards, the Court shall grant Plaintiffs' motion for preliminary approval of the settlement.  Considering the risks the plaintiffs would face in taking this case to trial, together with the value of all of the claims being released and the value of the proposed settlement to the class members in light of the apparent strengths and weakness of the claims and defenses, the Court concludes that the proposed settlement, on the current record, is "fair, reasonable, and adequate" within the meaning of Rule 23(e)(2).

---

the Ninth Circuit intended its holding to dictate that notice by U.S. mail without additional electronic notice is never sufficient, as this would eclipse the plain meaning of the Rule which states that "notice may be by *one* or more of the following: United States Mail, electronic means, or other appropriate means."  Fed. R. Civ. P. 23(c)(2)(B) (emphasis added).

/ / /

Accordingly, IT IS HEREBY ORDERED that:

1.  The motion for preliminary approval of the proposed settlement (ECF No. 28), as supplemented with an amended settlement agreement and declarations (ECF Nos. 44, 46-53), is GRANTED for the reasons described above, and subject to the terms below;

2.  A Final Approval Hearing will be held on **May 29, 2024, at 10:00 a.m., in Courtroom 9**, to determine whether the Settlement should be granted final approval as fair, reasonable, and adequate;

3.  The following persons are conditionally certified as Class Members solely for the purpose of entering a settlement in this matter:

    All non-exempt employees of Defendant who worked for Defendant in California during the Class Period (March 8, 2018 through the date upon which the Court grants preliminary approval of the settlement);

4.  ILYM Group, Inc. is appointed to act as the Administrator, pursuant to the terms set forth in the Agreement;

5.  Plaintiffs Maria Bustos Ramirez and Ramona Holguin are appointed the Class Representatives and the representative of the Settlement Class for settlement purposes only;

6.  Plaintiffs' Counsel, Moon Law Group, PC, Bohkour Law Group, P.C., and Melmed Law Group, are appointed Class Counsel; Class Counsel are authorized to act on behalf of the Class Representatives and the Settlement Class with respect to all acts or consents required by or which may be given pursuant to the Settlement and such other acts reasonably necessary to consummate the Settlement; the authority of Class Counsel includes entering into any necessary modifications or amendments to the Settlement on behalf of the Class Representatives and the Settlement Class which they deem appropriate;

7.  The settlement of Plaintiffs' California Labor Code Private Attorney General Act

("PAGA") claim is fair and reasonable, and the Court preliminarily approves the Settlement and release of that claim as well as the PAGA Allocation in the amount of $85,000.00, to be distributed and paid as 75% ($63,750.00) to the LWDA and as 25% ($21,250.00) to PAGA Employees;

8.   In the event this Order, the Final Judgment, or an Order Granting Final Approval of the proposed Settlement is overturned, reversed, not affirmed in its entirety or never becomes final, the Settlement Date does not occur, or the Settlement is nullified or invalidated for any reason, the fact that the Parties were willing to stipulate to class certification for purposes of the Settlement shall have no bearing on, nor be admissible in connection with, any issue in this Action or in any other action;

9.   Class Members will be bound by the Settlement unless they submit a timely and valid written request to be excluded from the Settlement within 60 days after mailing of the Class Notice by the Administrator (the "Response Deadline"); in the case of any re-mailed Notices, the Response Deadline will be the later of 60 calendar days after initial mailing or 14 calendar days from re-mailing;

10.  Any Settlement Class Member who wishes to object to the Settlement may submit his or her written comment or objection by the Response Deadline and/or appear (or hire an attorney to appear on their behalf) at the Final Approval Hearing and, if permitted by the Court, verbally state any comment or objection; any written objections shall be transmitted to the Court for the Court's review prior to the Final Approval Hearing;

11.  Prior to the Final Approval Hearing, Plaintiffs shall file a motion for final approval of the settlement, including a motion by Class Counsel for an award of attorneys' fees, costs, and service awards;

12.  Defendant is directed to provide the Administrator not later than 14 days after the date of this order the name, most recent known mailing address, Social Security number, and dates during which each individual was employed by Defendant in

California during the Class Period, in accordance with the Settlement;

13.   The Administrator is directed to mail the approved Class Notice by first-class mail to the Class Members in accordance with the Settlement;

14.   A Qualified Settlement Fund, as defined in Treasury Regulations Section 1.468B-1, or other applicable law, shall be established by the Administrator to effectuate the terms of the Settlement and the orders of the Court, and the Qualified Settlement Fund:

   a.   Shall be established pursuant to this Order of the Court prior to the receipt of any monies from Defendant;

   b.   Shall be established to resolve and satisfy the contested Claims that have resulted, or may result, from the matters that are the subject of this Action and that are released pursuant to the Settlement; and

   c.   Shall be established and its assets be segregated (within a separately established fund or account) from the assets of Defendant, and all related other persons in the meaning of Title 26, United States Code, Sections 267(b) and 707(b)(1);

15.   Any Settlement Class Member may appear at the Final Approval Hearing in person or by his or her own attorney, and offer to show cause why the Court should not approve the Settlement, or object to the motion for awards of the Class Representative Service Payments and Attorneys' Fees and Costs;

16.   The Court reserves the right to continue the date of the Final Approval Hearing without further notice to Class Members;

17.   The Court retains jurisdiction to consider all further applications arising out of or in connection with the Settlement;

18.   Neither this Order, the Settlement, nor any related statements or proceedings shall be construed or deemed an admission of liability, culpability, damage, or wrongdoing on the part of Defendant, or of the appropriateness of certification of the Class other than for settlement purposes;

19.  If the Court does not finally approve the proposed Settlement that is the subject of this Order, all evidence, briefing, and proceedings related to the Settlement shall have no force and effect, and the Parties shall be deemed to have reverted to their respective status as of the date and time immediately prior to the execution of the Settlement;

20.  To the extent permitted by law, pending final determination as to whether the Settlement should be approved, the Court hereby orders that the Class Representatives and all Settlement Class Members, whether directly, representatively, or in any other capacity, whether or not such persons have appeared in this litigation, shall not prosecute any claims or actions against Defendant or other Released Parties (as defined in the Settlement) in any forum, which would be covered by the release of claims as defined in the Settlement;

21.  The Court orders the following Implementation Schedule for further proceedings:

a.  Deadline for Defendant to comply with notice provisions of Class Action Fairness Act, 28 U.S.C. § 1715: **within 10 calendar days after filing of the Motion for Preliminary Approval**;

b.  Deadline for Defendant to Submit Class Member Information to Settlement Administrator: **within 14 calendar days after the Preliminary Approval Date**;

c.  Deadline for Settlement Administrator to Mail Notice to Class Members: **within 14 calendar days following the Preliminary Approval Date**;

d.   Deadline for Class Members to Postmark Challenges to Work Hour Disputes: **60 calendar days after mailing of the Class Notice plus 14 calendar days for re-mailed Notices**;

e.  Deadline for Class Members to Postmark Requests for Exclusion; **60 calendar days after mailing of the Class Notice plus 14 calendar days for re-mailed Notices**;

f.  Deadline for Class Members to Postmark Written Objections to Settlement: **60**

calendar days after mailing of the Class Notice plus 14 calendar days for re- mailed Notices;

g. Deadline for Settlement Administrator to Provide Class Counsel with Declaration of Due Diligence and Proof of Mailing: **14 calendar days prior to Deadline for Class Counsel to file Motion for Final Approval of Settlement**;

h. Deadline for Class Counsel to file Motion for Final Approval of Settlement (including any request for Attorneys' Fees and Expenses): **28 calendar days prior to the Final Approval/Fairness Hearing**;

i. Deadline for Settlement Administrator to mail the Settlement Awards, Service Award, and PAGA Payments, and to wire transfer the Attorneys' Fees and Costs (if Settlement is Effective): **28 calendar days after the Effective Date**;

j. Settlement Administrator to File Proof of Payment of Settlement Awards, Service Payments, Attorneys' Fees, and Costs (if Settlement is Effective): **190 calendar days after the Effective Date**;

k. If any of the dates in the above Implementation Schedule falls on a weekend or on a bank or court holiday, the time to act shall be extended to the next business day; and

l. Pending further order of this Court, all proceedings in this Action, except those contemplated herein and in the Settlement, are stayed.

IT IS SO ORDERED.

Dated:   **January 9, 2024**

UNITED STATES MAGISTRATE JUDGE